

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

APR 2 8 2005

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| YOLANDA AYALA as next friend of her brother RAMON AYALA, on behalf of a class of similarly situated persons, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05 C 1967 |
| THE CITY OF CHICAGO, et al. | ) ) | The Hon. James F. Holderman |
| Defendants. | ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Yolanda Ayala, as next friend of her brother Ramon Ayala and on behalf of a class of similarly situated persons (hereinafter, the "Plaintiff Class"), by her undersigned attorneys, respectfully moves this Court for entry of an order, pursuant to Rule 65 of the Federal Rules of Civil Procedure, preliminarily enjoining defendants City of Chicago and Chicago Police Superintendent Phil Cline from violating Plaintiffs' right to be free from illegal detention by the Chicago Police. In support, Plaintiff states:

1. This litigation concerns recurring violations of the rights of the Plaintiff Class[1] under the Fourth and Fourteenth Amendments to be free from unreasonable seizures and detentions. Specifically, the City of Chicago Police Department (hereinafter, "Police") is engaging in a practice and policy of detaining Chicago citizens who are witnesses in criminal investigations, and holding them for many hours, against their will, in Chicago police station interrogation rooms, even though the Chicago Police have no probable cause to suspect these

---

[1] A motion for certification of the Plaintiff Class is being submitted contemporaneously with this motion.

persons of any wrongdoing. These violations, which cause serious and substantial harm to the Plaintiff Class, are ongoing and threaten to routinely recur unless enjoined.

2.      It is well established that a plaintiff seeking a preliminary injunction must show: (1) that there is a reasonable likelihood of success on the merits; (2) that the plaintiff will suffer irreparable harm if the injunction is denied; (3) that the harm the plaintiff would suffer in the absence of a preliminary injunction will be greater than the harm the defendant would suffer if the injunction is granted; (4) that the plaintiff has no adequate remedy at law; and (5) that the injunction will not harm the public interest. *Roland Machinery Co. v. Dresser Industries Inc.*, 749 F.2d 380, 386-88 (7th Cir. 1984); *accord Cooper v. Bombela*, 34 F. Supp. 2d 693, 698 (N.D. Ill. 1999).

3.      Each of these conditions is met in this case. *First*, Plaintiffs have a reasonable likelihood of success on the merits of the claim asserted against the City of Chicago and the Superintendent of Police. Under *Monell v. Department of Soc. Serv.*, 436 U.S. 658 (1978), plaintiffs suing a local government unit under 42 U.S.C. § 1983 must allege that the government defendants have engaged in a custom or policy that has deprived the plaintiffs of their constitutional rights.

4.      Plaintiffs in the present case make such a claim. Plaintiffs allege that Defendants have engaged in a practice of detaining Chicago citizens who are witnesses in criminal investigations and holding them against their will in police station interrogation rooms, even though the Police have no probable cause to suspect these persons of any criminal wrongdoing. At a hearing, plaintiffs will be able to establish that this practice is in fact occurring and that it threatens to recur unless and until it is enjoined. In addition, plaintiffs can show that the Police witness detention policy is a clear violation of fundamental Fourth Amendment principles.

2

5.　　Plaintiffs' counsel have already amassed evidence that the Police, as a matter of standard operating procedure, detain witnesses in locked interrogation rooms for questioning without probable cause to arrest. By way of example, plaintiffs' counsel deposed two Police detectives in *Johnson v. City of Chicago*, No. 03 C 6620 (N.D. Ill.), a currently pending case seeking damages on behalf of five illegally detained witnesses, who admitted that it is "standard procedure when leaving [a] witness alone in [an interview] room to lock the door;" that it is not "unusual" or "inconsistent with the way [officers have] been trained" to hold a witness "in an interview room . . . for 20 hours without being interviewed," or longer in some cases; and that it is not "unusual . . . to place a witness in an interview room . . . for two days." In fact, one detective was "aware of [witnesses] being in interview rooms for longer than 72 hours." *See* Kevin Scott Dep. Tr. at 223-24, 243-45, 289-90, attached as Exhibit A; Mason Dep. Tr. at 43-44, 46-47, 139-40, 171-73, attached as Exhibit B.

6.　　In addition, defendant Cline has admitted under oath in injunctive proceedings in *First Defense Legal Aid v. City of Chicago*, 225 F. Supp. 2d 870 (N.D. Ill. 2002), *rev'd on other grounds*, 319 F.3d 967 (7th Cir. 2003), that the Chicago Police employ standard procedures in their treatment of witnesses at Chicago Police stations. Based on Defendant Cline's testimony and that of Chicago Police Detective John Farrell, the District Court in *First Defense* found that the Chicago Police systematically engage in the following procedure with respect to witness detentions:

> (a) Witnesses are taken to police stations for questioning, are thoroughly searched, and are then "secured" by being locked in small, windowless interrogation rooms with no toilets, no running water, and typically furnished only with a metal bench bolted to the wall.

3

(b) Witnesses typically remain in such rooms for many hours, and in some cases for days.

(c) When a witness' lawyer appears at the police station and asks to speak with his or her client, the Chicago Police routinely refuse to grant the lawyer access to the witness.

(d) The Chicago Police confine witnesses in these conditions in order to "overcome their reluctance" to cooperate with the police.

(e) Witnesses confined in these conditions are not free to leave the police stationhouses and are, in fact, confined there against their will.

*First Defense Legal Aid*, 225 F. Supp. 2d at 875, 877-78.[2]

4.        This practice is clearly unconstitutional. In *Dunaway v. New York*, 442 U.S. 200, 206-07 (1979), the Supreme Court held that the police violated the Fourth and Fourteenth Amendments when, "without probable cause to arrest, they took petitioner into custody, transported him to the police station, and detained him there for interrogation." The practice at issue in this case is governed by *Dunaway* and constitutes a clear constitutional violation.[3] Indeed, the Police practice exactly what the Supreme Court banned in *Dunaway*: they take witnesses into custody, transport them to the police station, and detain them there for questioning, all without probable cause.

---

[2] The factual findings in the *First Defense* case, including those recited above, were not challenged in the Seventh Circuit, which reversed the District Court on a pure question of First Amendment law. *See* 319 F.3d at 972-73.

[3] The Supreme Court in *Dunaway* said that the petitioner's detention by the police, without consent and without probable cause, was an arrest, and reaffirmed the long-standing principle that any arrest without probable cause is unconstitutional. *See Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975) ("The standard for arrest is probable cause."); *Ker v. California*, 374 U.S. 23, 34-35 (1963) (to be lawful arrest without warrant must be based on probable cause).

6.      Therefore, the Plaintiff Class has a reasonable likelihood of success on the merits of its case.

7.      *Second*, the defendants' continued practice of illegally detaining members of the Plaintiff Class causes irreparable harm.  Unless this practice is enjoined, current and future members of the Plaintiff Class will be deprived of their liberty.  Plaintiffs will not only suffer incalculable psychological harm from the fear, sense of coercion, and deprivation of freedom they suffer from being detained, without probable cause, by government agents.  They will also suffer physically, as they are often held without adequate nourishment or sleep in small interrogation rooms, with no beds, no toilets, and no running water.  Finally, Plaintiffs will suffer from the loss of the dignity they are due as United States citizens, as the Chicago Police violate their Fourth Amendment and Fourteenth Amendment rights to be free from unreasonable seizures and detentions.

8.      Plaintiffs who can show, "by some evidence, that they had been deprived of a constitutional right . . ., as a matter of law, also satisfy the burden of showing irreparable harm." *David K. v. Lane*, 839 F.2d 1265, 1268 (7th Cir. 1988).  Plaintiffs, as discussed above, can easily show that the Police violated, or will violate, their Fourth Amendment and Fourteenth Amendment rights.  Thus, they would suffer irreparable harm if a preliminary injunction were not issued.

9.      *Third*, the Plaintiff Class has no adequate remedy at law.  It is well established that the violation of constitutional rights is not remediable by an award of money damages.  *See, e.g.*, *National People's Action v. Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (holding that injunctions are "especially appropriate" in the context of constitutional violations because of the inadequacy of money damages).

9.    *Fourth*, the balance of harms weighs in favor of the Plaintiff Class. The defendants will not be harmed by a preliminary injunction that merely requires their compliance with law. In contrast, current and future members of the Plaintiff Class will face serious and harmful illegal deprivations of their liberty if the preliminary injunction is not awarded.

10.    *Fifth*, a preliminary injunction in this case will not harm the public interest. Such an injunction will, in fact, serve the public interest by protecting the constitutional rights of citizens to be free from unreasonable seizures and detentions by the Chicago Police. The protection of such rights is a fundamental public interest. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992) (stating that there is a "public interest in Government observance of the Constitution and laws"); *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984) (holding that issuing a preliminary injunction to protect plaintiff's constitutional rights is in the public interest); *Ayres v. City of Chicago*, 966 F. Supp. 701, 717 (N.D. Ill. 1997) (same).

WHEREFORE, Plaintiffs respectfully request that this Court (1) set an evidentiary hearing on this motion; (2) order that discovery in this case be expedited so that the hearing on this motion may occur with reasonable promptness; and (3) at the conclusion of the hearing, award the Plaintiff Class a preliminary injunction barring the defendants from continuing to

6

unconstitutionally seize and detain current and future members of the Plaintiff Class.

Respectfully submitted,

**YOLANDA AYALA as next friend on behalf of RAMON AYALA**

By: _____
One of her attorneys

Craig B. Futterman
Mandel Legal Aid Clinic
University of Chicago Law School
6020 South University
Chicago, IL 60637
773-702-9611

Locke E. Bowman
MacArthur Justice Center
University of Chicago Law School
1111 East 60th Street
Chicago, IL 60637
773-753-4405

John P. Duchemin, a second year student at the University of
Chicago Law School, assisted in the preparation of this document.



1        IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF ILLINOIS

3               EASTERN DIVISION

4   GAIL JOHNSON, et al.,          )
                                    )
5           Plaintiffs,            )
                                    )
6       vs.                        )   No. 03 C 6620
                                    )
7   THE CITY OF CHICAGO, et         )
    al.,                            )
8                                   )
            Defendants.            )
9

10          The continued deposition of KEVIN

11   PAUL SCOTT called for examination pursuant to

12   Notice and the Rules of Civil Procedure for the

13   United States District Courts pertaining to the

14   taking of depositions, taken before Sandra Eberle,

15   a notary public within and for the County of Cook

16   and State of Illinois, at 1111 East 60th Street,

17   Chicago, Illinois, on the 24th day of February,

18   2005, at the hour of 1:00 p.m.

19

20

21

22

23   Reported by:  Sandra Eberle, RPR, CRR

24   License No.:  084-003229

                                                    171

```
 1   APPEARANCES:

 2

 3        THE MacARTHUR JUSTICE CENTER
          UNIVERSITY OF CHICAGO LAW SCHOOL
          BY:  MR. LOCKE E. BOWMAN
 4        1111 East 60th Street
          Chicago, IL  60637
 5        (773) 753-4405
                    Representing the Plaintiff;
 6
          MR. CRAIG B. FUTTERMAN
 7        EDWIN F. MANDEL LEGAL AID CLINIC
          University of Chicago Law School
 8        6020 South University Avenue
          Chicago, IL  60637
 9        (773) 702-9611
                    Representing the Plaintiff;
10
          MR. GEORGE J. YAMIN, JR.
11        Assistant Corporation Counsel
          Department of Law, Room 900
12        Commercial & Policy Litigation Division
          30 North LaSalle Street
13        Chicago, IL  60602
          (312) 742-0170
14                  Representing the Defendants, City of
                    Chicago, Cline and Hillard;
15
          PUGH, JONES, JOHNSON & QUANDT, P.C.
16        BY:  MR. JOHN M. BRODERICK
          180 North LaSalle Street, Suite 3400
17        Chicago, IL  60601
          (312) 551-1002
18                  Representing the Defendant Detectives.

19   ALSO PRESENT:

20        ANDREW CORCORAN, law student
          JOHN DUCHEMIN, law student
21        ANAND SHETH, law student
          REGINA BLACKLEDGE, Star Number 21203

22

23

24
```

172

1                        I N D E X

2      WITNESS                                    PAGE

3      KEVIN PAUL SCOTT

4          By Mr. Bowman

5              Direct Examination (Continued)     174

6          By Mr. Broderick

7              Cross-examination                   292

8

9

10

11

12

13                     E X H I B I T S

14     NUMBER                              MARKED FOR ID

15     Plaintiffs' Exhibit

16         No. 13                              248

17         No. 14                              270

18         No. 15                              286

19

20             (Exhibits retained by counsel)

21

22

23

24

                                                    173

1      Q.    But you, yourself, hadn't interviewed her

2  up until 21 and a half hours after her arrival?

3      A.    Approximately.

4      Q.    And the original interview that your

5  assisting colleagues conducted with her took place

6  a little before 8:00 p.m. on December 17, right?

7      A.    Yes, sir.

8      Q.    So from 8:00 p.m. on December 17 until

9  your substantive interview, over 20 hours had gone

10  by, right?

11      A.    Yes.

12      Q.    Is it unusual in your experience for a

13  witness to remain in an interview room with a

14  couple of bathroom breaks and trips to the

15  telephone for 20 plus hours without being

16  interviewed?

17      MR. YAMIN:    Object to the form, foundation.

18  BY MR. BOWMAN:

19      Q.    Is that unusual?

20      A.    It depends.

21      Q.    What does it depend on?

22      A.    It depends on the course of the

23  investigation.

24      Q.    So in your experience, has -- is it common

223

1  for the course of an investigation to be such that

2  a witness might remain in an interview room at Area

3  2 for 20 hours without being interviewed?

4      MR. YAMIN:  Object to the form.

5      THE WITNESS:  I wouldn't say that it's common.

6  BY MR. BOWMAN:

7      Q.   Is it unusual?

8      MR. YAMIN:  Same objection.

9      MR. BRODERICK:  Calls for speculation.

10  BY MR. BOWMAN:

11      Q.   In your experience?

12      A.   It just depends, sir.  I wouldn't say that

13  it's common.

14      Q.   Would you say that it's unusual?

15      MR. YAMIN:  Objection.

16      MR. BRODERICK:  Objection.  It's also vague as

17  to his experience regarding his witnesses or his

18  experience.

19  BY MR. BOWMAN:

20      Q.   Let's start with his witnesses.  Is this

21  something you've done in the past prior to this

22  particular occasion, have a witness for that period

23  of time --

24      A.   I don't recall, sir.

1      Q.  -- and not interview them?  Is it possible

2    that you had?

3      MR. BRODERICK:  Objection, vague.

4      THE WITNESS:  I don't recall.

5    BY MR. BOWMAN:

6      Q.  Did any sergeant at any point up until

7    4:30 p.m. on December 18 ever say to you that you

8    were doing something wrong by having witnesses,

9    five witnesses, present in interview rooms for over

10   21 hours?

11     MR. YAMIN:  Objection, form.

12     THE WITNESS:  No.

13   BY MR. BOWMAN:

14     Q.  Having five witnesses in interview rooms

15   for 20 hours, was that consistent with the way you

16   were trained to interact with witnesses?

17     MR. YAMIN:  Objection, form.

18     THE WITNESS:  I wasn't trained to interact with

19   witnesses for a particular period of time.

20   BY MR. BOWMAN:

21     Q.  When I was questioning you earlier, you

22   told me that you were trained that if a witness is

23   placed in an interview room and the witness is not

24   handcuffed and the witness is -- and the door is

1    MR. BRODERICK: You identified the exact

2    concerns that I'm going toward and we'll have to

3    work out how it's going to be tried.

4    BY MR. BOWMAN:

5        Q.    Now, Bluford at this point has been there

6    for 23 hours in an interview room like Ms. Johnson

7    at 6:00 o'clock on December 18 when you went in to

8    talk with him, right?

9        A.    Approximately, yes.

10        Q.    This is your first meeting with Bluford,

11    right, or am I wrong about that?

12        A.    Yes.

13        Q.    Is it inconsistent in any way with the

14    practice and procedure that your -- that you employ

15    as a detective for you to have a witness present in

16    an interview room for 23 hours during the course of

17    an investigation without having an interview with

18    the person?

19        MR. YAMIN: Objection, form.

20        THE WITNESS: No, sir. It depends on the

21    investigation that we are conducting and what we're

22    doing at the time.

23    BY MR. BOWMAN:

24        Q.    So this is not out of the ordinary in any

1   way, to have this witness present for 23 hours in

2   an interview room before you talked to him, right?

3      MR. YAMIN:  Same objection.

4      THE WITNESS:  It's possible that it could

5   occur.

6   BY MR. BOWMAN:

7      Q.   It did occur here.  And what I'm asking

8   is, is this something that is consistent with what

9   you've done in the past and what you've seen other

10   detectives do in the past?

11      A.   I can't --

12      MR. BRODERICK:  Asked and answered.

13      MR. YAMIN:  I object to form.  And you asked

14   him what he has seen in the past?

15      THE WITNESS:  I can't answer for other

16   detectives, what they have done in regard to any

17   witnesses that have participated in investigations.

18   I don't really recall how long they were there.

19   It's possible that they were there that length of

20   time as well.  It's possible.

21   BY MR. BOWMAN:

22      Q.   Without being interviewed?

23      A.   Up until the time that they were

24   interviewed.  It's possible.

1       Q.    Did anybody say to you -- strike that.

2             Did any sergeant or other supervisor say

3    to you that you had done anything wrong by having a

4    witness present in an interview room for 23 hours

5    before you spoke with him?

6       MR. YAMIN:    Objection to form.

7       THE WITNESS:    No.

8    BY MR. BOWMAN:

9       Q.    And when you spoke with Bluford, he gave

10   you an account of the shooting, right?

11      A.    Yes, he did.

12      Q.    And he named the individual who had fired

13   the fatal shot, correct?

14      A.    Yes.

15      Q.    Now, you had the identity of the

16   perpetrator for the first time, right?

17      A.    Correct.

18      Q.    Then what did you do?

19      A.    Myself and my partner showed Mr. Bluford

20   photos of -- a photo where he identified the same

21   offender that he spoke of in his interview.

22      Q.    And then what did you do?

23      A.    We contacted the state's attorney.

24      Q.    And the point of having the state's

245

1    THE WITNESS:  It's such a broad scenario for

2    comparison, one person versus another based on the

3    level of investigation.

4    BY MR. BOWMAN:

5        Q.    And you're having trouble with the

6    question because I've asked with respect to so many

7    different witnesses or is it because it's hard to

8    define the police practice in such a broad area?

9        MR. BRODERICK:  Objection to the repetitive

10   nature of the question, compound and vague.  He

11   explained why he didn't understand the question.

12       THE WITNESS:  All of the above.

13   BY MR. BOWMAN:

14       Q.    What I'm really trying to figure out is

15   whether in your understanding of the way you're

16   supposed to conduct yourself in terms of the way

17   you've been trained and the way your superiors

18   evaluate you, is there anything that you did in

19   relation to any of the witnesses that I mentioned,

20   the two Johnsons, Brewer, Bluford, and Whitsey and

21   Pierce, that was out of line in any respect?

22       MR. YAMIN:  Objection to the question and

23   foundation.

24       THE WITNESS:  Out of line meaning?

1   BY MR. BOWMAN:

2       Q.   Meaning inconsistent with how you were

3   trained and expected to comport yourself in

4   relation to witnesses.

5       A.   No.

6       MR. BOWMAN:   Now we will take a quick break,

7   and I think we are very near the end.

8                       (A break was taken.)

9   BY MR. BOWMAN:

10      Q.   Just a couple of questions, Detective.

11  Did you at any time ever have probable cause to

12  arrest Leo Pierce?

13      MR. BRODERICK:   Objection to the extent it

14  calls for a legal conclusion.

15      THE WITNESS:   No.

16  BY MR. BOWMAN:

17      Q.   And second, Detective, have you, yourself,

18  ever had the occasion to locate an individual who

19  is wanted for questioning only pursuant to an

20  investigative alert?

21      A.   I may have.   I can't recall specifically.

22      Q.   In the situation in which a police officer

23  locates an individual who is wanted for questioning

24  only under an investigative alert, what is the



1                IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF ILLINOIS

3                        EASTERN DIVISION

4   GAIL JOHNSON, et al.,            )
                                     )
5               Plaintiffs,          )
                                     )
6      vs.                           )    No. 03 C 6620
                                     )
7   THE CITY OF CHICAGO, et          )
    al.,                             )
8                                    )
                Defendants.          )
9

10               The deposition of MICHAL MASON,

11   called for examination pursuant to Notice and the

12   Rules of Civil Procedure for the United States

13   District Courts pertaining to the taking of

14   depositions, taken before Sandra Eberle, a notary

15   public within and for the County of Cook and State

16   of Illinois, at 1111 East 60th Street, Chicago,

17   Illinois, on the 22nd day of February, 2005,

18   scheduled to commence at 10:00 a.m., and commencing

19   at 10:30 a.m.

20

21

22

23   Reported by:  Sandra Eberle, RPR, CRR

24   License No.:  084-003229

1   APPEARANCES:

2

     THE MacARTHUR JUSTICE CENTER
3    UNIVERSITY OF CHICAGO LAW SCHOOL
     BY:  MR. LOCKE E. BOWMAN
4    1111 East 60th Street
     Chicago, IL  60637
5    (773) 753-4405
         Representing the Plaintiff;

6

     EDWIN F. MANDEL LEGAL AID CLINIC
7    UNIVERSITY OF CHICAGO LAW SCHOOL
     BY:  MR. CRAIG B. FUTTERMAN
8    6020 South University Avenue
     Chicago, IL  60637
9    (773) 702-9611
         Representing the Plaintiff;

10

     MS. SARA ELLIS
11   Assistant Corporation Counsel
     Department of Law, Room 900
12   Commercial & Policy Litigation Division
     30 North LaSalle Street
13   Chicago, IL  60602
     (312) 742-0170
14        Representing the Defendants, City of
         Chicago, Cline and Hillard;

15

     PUGH, JONES, JOHNSON & QUANDT, P.C.
16   BY:  MR. JOHN M. BRODERICK
     180 North LaSalle Street, Suite 3400
17   Chicago, IL  60601
     (312) 551-1002
18       Representing the Defendant Detectives.

19  ALSO PRESENT:
     RICHARD MILZ, detective
20   ANDREW CORCORAN, law student
     JOHN DUCHEMIN, law student

21

22

23

24

                         2

1                              I N D E X

2      WITNESS                                    PAGE

3      MICHAEL MASON

4          By Mr. Bowman

5              Direct Examination                4

6              Redirect Examination            259

7              Further Redirect Examination    289

8                                              295

9          By Mr. Broderick

10             Cross-examination               245

11             Recross-examination             288

12         By Ms. Ellis

13             Cross-examination               255

14             Recross-examination             294

15

16                            E X H I B I T S

17     NUMBER                              MARKED FOR ID

18     Plaintiffs' Exhibit

19         No. 9                               83

20         No. 10                             200

21         No. 11                             213

22         No. 12                             232

23             (Exhibits retained by counsel)

24

3

1    Q.   If you thought the person had significant

2    knowledge that you needed in your investigation,

3    would that cause you to be more likely to put the

4    person in an interview room?

5    A.   Yes.

6    Q.   If you thought that the person was going

7    to be at the police station for a day, would that

8    cause you to be more likely to put the person in an

9    interview room?

10    A.   Yes.

11    Q.   How about if the person was going to be at

12    the police station for two days, would that make

13    you more likely to put the person in an interview

14    room?

15    A.   I wouldn't really know that at the

16    beginning, but if somehow I had a crystal ball and

17    knew they were going to be there for two days, I

18    would probably -- I would think I would want to put

19    them in an interview room so that nobody else --

20    you know, two days is a long time.  People would be

21    coming and going.

22    Q.   Is it unusual in your experience to place

23    a witness in an interview room and have them there

24    for a day?

43

1      A.   Unusual?

2      Q.   Right.

3      A.   No.

4      Q.   How about for two days, is that unusual?

5      A.   No.

6      Q.   In your on-the-job training, have you

7 gotten any instruction on the rights of witnesses

8 to leave the police station after you brought them

9 in for an interview?

10     MS. ELLIS:  Asked and answered.

11 BY MR. BOWMAN:

12      Q.   This may be a question I've asked you

13 before.  And if it is, I apologize.  Could you go

14 ahead and bear with me and answer it again?

15      A.   In my on-the-job training?

16      Q.   Right.

17      A.   I don't recall.

18      Q.   How about the rights of witnesses to

19 receive visitors, have you been instructed about

20 that in your on-the-job training?

21     MS. ELLIS:  Objection, asked and answered.

22     MR. BRODERICK:  Objection.

23 BY MR. BOWMAN:

24      Q.   Again I may have asked you it before.  If

1      THE WITNESS:  I don't recall.

2  BY MR. BOWMAN:

3      Q.   In your on-the-job training, have you had

4  instruction concerning the rights of witnesses to

5  be fed and to drink?

6      MS. ELLIS:  Objection, asked and answered.

7      THE WITNESS:  I don't recall.

8  BY MR. BOWMAN:

9      Q.   In your on-the-job training, have you had

10  any instruction about how long it is appropriate to

11  leave a witness secured in an interview room?

12      MS. ELLIS:  Objection, asked and answered.

13      THE WITNESS:  I don't recall.

14  BY MR. BOWMAN:

15      Q.   Have you been told that a witness should

16  not remain in an interview room for longer than 72

17  hours?

18      A.   I don't believe I've ever been told that.

19      Q.   Have you had occasion to confine -- sorry.

20  Have you had occasion to place -- to secure a

21  witness in an interview room for 72 hours or

22  longer?

23      A.   My recollection is that I've -- I'm aware

24  of people being in interview rooms for longer than

1   72 hours, but specifically I don't remember the

2   case or the names of the people.

3       Q.   Witnesses you're referring to?

4       A.   Correct.

5       Q.   Now, let's have a look at Exhibit 8.  Did

6   you author Exhibit 8?

7       A.   Yes.

8       Q.   And how about your partner, Detective

9   Milz, did he have any role in authoring Exhibit 8?

10      A.   Yes.

11      Q.   How did you divide the responsibility for

12  writing this report?

13      A.   I don't recall.

14      Q.   Do you recall the Walter Givens murder

15  investigation?

16      A.   I do.

17      Q.   Do you recall the -- strike that.

18           What were the circumstances of your being

19  assigned to the case?

20      A.   I'm not sure I understand that.

21      Q.   When were you assigned to the Walter

22  Givens murder investigation?

23      A.   Shortly after it happened.

24      Q.   When was that?

1  along those lines?

2      A.   Yes.

3      Q.   And my question was it's not unusual for a

4  witness to be secured in an interview room for 24

5  hours in your experience; isn't that right?

6      A.   That's correct.

7      Q.   And it's also not unusual for a witness to

8  be secured in an interview room for as much as 48

9  hours, isn't that right, in your experience?

10     A.   Correct.

11     Q.   The automobile that Ms. McFall was placed

12  in, you say she was put into the backseat; is that

13  right?

14     A.   I didn't put her in the backseat.  I

15  opened the back door for her.

16     Q.   And she got into the backseat?

17     A.   Yes.

18     Q.   And then you closed the door, right?

19     A.   Yes.

20     Q.   From the inside of the car, can the

21  passenger of the backseat open that door?

22     A.   Yes.

23     Q.   When you got to police headquarters, did

24  you open the door for Ms. McFall or did she open

79

1  left Natalie McFall?

2     A.   I believe we discussed this already.  The

3  safety of the people on the floor.

4     Q.   It's for her safety?

5     A.   Right.

6     Q.   So it would be your standard procedure

7  when you have a witness in an interview room and

8  you're leaving that witness alone in the room to

9  lock the door?

10    A.   Yes.

11    Q.   And you do that all the time?

12    A.   I can't say I do it all the time.  But I

13  generally do it.

14    Q.   You intend to do it all the time?

15    A.   Again we discussed instances where --

16 interviews where nobody else is on the floor.

17 There's no chance that other people are going to

18 see you.  I may not lock the door right then.

19 However, I may lock the door at a later time.

20    Q.   You told us that at the conclusion of your

21 conversation with Lisa Maniglia, after she had been

22 at Area 5 for about two hours, you offered her a

23 ride home, right?

24    A.   Yes.

                                                     139

1     Q.   When you and Detective Milz were leaving

2   work the morning -- early morning of October 29,

3   did you offer Natalie McFall a ride home?

4     A.   No.

5     Q.   Why not?

6     A.   She had agreed to stay there.

7     Q.   Did you at any point ever say to Natalie

8   McFall that she would be perfectly free to leave if

9   she would like to?

10    A.   I don't believe I said that, no.

11    Q.   Did Detective Milz?

12    A.   I don't recall him saying that.

13    Q.   Do you have any reason to believe he did

14  say that?

15    A.   No.

16    Q.   When Detective Milz picked up the food for

17  Natalie McFall, is it your understanding that

18  Detective Milz paid for that food?

19    A.   Yes.

20    Q.   Did he get reimbursed for it?

21    A.   He may have been reimbursed partially by

22  me.  But we usually share those costs.

23    Q.   Did --

24    MR. BRODERICK:  Are you done answering the

1    36 hours?  Do I have that right?

2        A.    Let's see.  What time --

3        Q.    Actually it's 38 hours, I think.  Is that

4    right?

5        MR. BRODERICK:  I'm sorry.  Are we talking

6    midnight, 28, 29 to midnight to the polygraph?

7        MR. BOWMAN:  To the polygraph at 3:00 p.m. on

8    October 30th.  That's a total of 38 hours, right.

9        THE WITNESS:  Approximately, yes.

10   BY MR. BOWMAN:

11       Q.    Now, is it unusual for you to have a

12   witness locked in an interview room for a 38-hour

13   period of time, right?

14       A.    No.

15       Q.    Is that pretty commonplace?

16       MR. BRODERICK:  Objection, understanding of

17   commonplace.

18       THE WITNESS:  It's not unusual.

19   BY MR. BOWMAN:

20       Q.    Is that standard operating procedure?

21       A.    I wouldn't refer to it as standard

22   operating procedure, no.

23       Q.    But it wasn't inconsistent with your

24   training to do that, right?

1    A.    No.

2    Q.    It wasn't inconsistent with anything

3    anybody had ever told you, right?

4    A.    No.

5    Q.    And you had witnesses in rooms -- in

6    locked interview rooms for that period of time

7    previous, right?

8    A.    Yes.

9    Q.    And subsequent, right?

10   A.    Yes.

11   Q.    And even longer, right, than 38 hours?

12   A.    Yes.

13   Q.    Yes?

14   A.    Yes.

15   Q.    And no one has ever suggested to you that

16   you're violating any rules or doing anything wrong

17   by locking witnesses in interview rooms for 38

18   hours or more, right?

19   MS. ELLIS:  Objection to the form of the

20   question, locking.

21   BY MR. BOWMAN:

22   Q.    I'm going to ride with that because I

23   think we established that what you did is you

24   locked Natalie McFall in the room, right?

```
 1        A.    Correct.

 2        Q.    So that's my question.

 3              Sandy, if you could read it back.

 4                        (Record read.)

 5        THE WITNESS:  Correct.

 6   BY MR. BOWMAN:

 7        Q.    In addition to yourself, you've seen --

 8   you've made observations of other detectives at

 9   Area 5 who have locked witnesses in interview rooms

10   for 38 hours or more, right?

11        A.    Yes.

12        Q.    On a number of occasions, right?

13        A.    Yes.

14        Q.    Before Natalie McFall, right?

15        A.    Correct.

16        Q.    And subsequent to Natalie McFall, correct?

17        A.    Yes.

18        Q.    And no one has ever complained or

19   criticized them for doing that, right?

20        MS. ELLIS:  Objection, speculation.

21   BY MR. BOWMAN:

22        Q.    To your knowledge?

23        A.    Not to my knowledge.

24        Q.    When you transported Natalie McFall to
```

1    Q.   Well, in handling yourself, at those other

2    areas, have you, when you've been there, made sure

3    that the door was locked whenever you left a

4    witness or a suspect that you've been speaking with

5    at other areas unaccompanied?

6    A.   Yes.

7    Q.   And did you do that because it was your

8    understanding that department policy required that?

9    A.   It was my understanding that it was

10   probably a universal rule, but I didn't know for

11   certain that every area was the same.

12   Q.   Well, you remember earlier in this

13   deposition we took a look at Detective Division

14   Special Order 99-2.  Remember that?

15   A.   Yes.

16   Q.   And that detective division special order

17   stated that detectives were to -- before placing a

18   witness or a suspect in an interview room, to

19   thoroughly search the person and to secure the

20   individual in the room, right?

21   A.   Yes.

22   Q.   And so would it be fair to say that it was

23   communicated to you via the detective division

24   orders in addition to what you learned from roll

1  call and from other detectives that there was this

2  requirement that the door be locked whenever any

3  individual was unaccompanied in an interview room?

4      MR. BRODERICK:  I'm just going to object, asked

5  and answered.

6      THE WITNESS:  I would agree with that.

7  BY MR. BOWMAN:

8      Q.  You testified a few minutes ago that it

9  was in your experience not unusual for a witness to

10  want to remain in a locked interview room for 24

11  hours.  Did I get that right?

12      A.  Yes.

13      Q.  How many witnesses have you known who

14  wanted to remain in a locked interview room for 24

15  hours?

16      A.  I don't believe I could put a number on

17  it.  But I would say that there were many over the

18  years.

19      Q.  Would you say dozens?

20      A.  That would be fair.

21      Q.  How about 50, 100?

22      MR. BRODERICK:  Objection, calls for

23  speculation.

24      THE WITNESS:  I don't know that I could -- I

1    don't know that I could answer that with a number.

2    But dozens seems like a fair answer.

3    BY MR. BOWMAN:

4        Q.   Can you give me the names of any of those

5    witnesses who wanted to remain in a locked

6    interview room for 24 hours?

7        A.   I don't believe I can.

8        Q.   Is there anything that can help you

9    remember those names?

10       A.   Not that I can think of.

11       Q.   What helps you -- what makes you confident

12   in your testimony that there were dozens who wanted

13   to remain in a locked interview room for 24 hours?

14       A.   From my memories of those incidents.

15       Q.   Let me ask you this:  Is that because in

16   your memory every witness that you ever locked in

17   an interview room for 24 hours wanted to remain

18   there?  Is that what you're telling us?

19       MR. BRODERICK:  Objection to the form of the

20   question.

21       THE WITNESS:  Could you repeat that question?

22       MR. BOWMAN:  Sandy will read it.

23                      (Record read.)

24       MR. BRODERICK:  Objection, vague as to wanted.

1     his answer.

2     BY MR. BOWMAN:

3       Q.   I'm sorry. Go ahead.

4       A.   But I have a recollection of other people

5     there that, you know, I didn't put in the room that

6     were there and wanted to be there.

7       Q.   But you can't tell us the names of any of

8     those people?

9       A.   I don't know the names.

10      Q.   Can you tell us anything about the

11    investigations that involve those people?

12      A.   I don't really have any specifics on the

13    investigations.

14      Q.   Can you tell us anything at all that would

15    help us to track those people down so that we could

16    talk to them and ask them if they wanted to be in

17    those interview rooms as you've testified?

18      A.   I can't think of anything that would help

19    right now.

20      Q.   You also said that it's not unusual for a

21    witness to want to remain in a locked interview

22    room at area headquarters for 36 hours?

23      A.   Correct.

24      Q.   Can you give me the name of any witness

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he served the foregoing Plaintiff's Motion for Preliminary Injunction upon all parties listed on the attached service list by hand delivery before the hour of 5:00 p.m. on Thursday, April 28, 2005.

Locke E. Bowman