IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RAMON AYALA and KYLE W. DAVIS, individually and on behalf of a class of similarly situated persons, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, a municipal corporation, and PHIL CLINE, Superintendent of the Chicago Police Department <br><br> Defendants. | No. 05 C 1967 |

## MEMORANDUM OPINION AND ORDER REGARDING CLASS CERTIFICATION

JAMES F. HOLDERMAN, District Judge:

On June 18, 2005, plaintiffs Ramon Ayala ("Ayala"), and Kyle W. Davis ("Davis") filed a second amended complaint under 42 U.S.C. § 1983 against the City of Chicago ("City") and Superintendent of Police Phil Cline ("Cline") on behalf of themselves and a class of other similarly situated individuals. (Dkt. No. 35.) In that complaint, the plaintiffs allege that the Chicago Police Department ("CPD") has an unconstitutional policy, custom, or widespread practice of holding witnesses against their will without probable cause in violation of the Fourth Amendment. Before this court is the plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23(b)(2) for injunctive relief. (Dkt. No. 7.) For the reasons stated below, this court certifies the class under Rule 23(b)(2).

## BACKGROUND

From October 3, 2005 through November 2, 2005, the court conducted a multi-day

evidentiary hearing as to plaintiffs' motion for preliminary injunction. At that hearing, testimony was provided by persons allegedly held against their will without probable cause at certain Chicago police stations, as well as CPD supervisory personnel and detectives. Other witnesses including expert witnesses called by the parties also testified. Additionally, numerous exhibits were presented for the court's consideration.

At the hearing, the parties entered a stipulation that between January 1, 2004 and July 19, 2005, 100 witnesses were interviewed at Chicago area police stations in 28 randomly selected first degree murder investigations. (Pl. Ex. 49.) Those 28 cases were selected from a universe of 204 closed and cleared files in first degree murder investigations conducted by the CPD during that time period.[1] (*Id.*)

This court also heard evidence about the treatment of certain witnesses by CPD personnel at police stations. The evidence establishes that it is the practice of the CPD that when persons who have witnessed criminal conduct are taken to police stations, they are generally placed in small windowless rooms, which are the same rooms used by CPD personnel to interrogate criminal suspects. (Hr'g Tr. at 567-69.) These interview rooms typically have only one door that locks from the outside. (Hr'g Tr. at 569, 571; Pl. Ex. 6, 6(a).) Generally, each room has a metal bench bolted to the floor or wall. (Hr'g Tr. at 570; Pl. Ex. 6.) The walls are typically made of cinder block material and have metal rings, to which handcuffs may be attached, affixed to the walls. (Hr'g Tr. at 570; Pl. Ex. 6.) The fluorescent lights in the interview rooms are controlled by a switch located outside the room. The rooms have no clock, toilet, or running water. (Hr'g

---

[1] Plaintiffs obtained this information through the discovery process for the purposes of Federal Rule of Civil Procedure 23(a)'s numerosity requirement.

Tr. at 572.)

It is not uncommon for a witness to stay in an interview rooms for longer than 24 hours. (Hr'g Tr. at 580; Molloy Dep. at 82, line 5-8.) With the exception of the CPD Area 2 station, witnesses are always locked in the interview rooms while waiting to answer the detectives' questions. (*Id.* at 667.) Witnesses are told to knock on the locked door and someone will assist them if the witnesses needs anything, including use of the bathroom facilities or food and drink. (Hr'g Tr. at 584-85.) Detectives who voluntarily provide food and drink for witnesses are not reimbursed for the cost. (*Id.* at 586.)

A witness, while at the police station, is typically not informed by the CPD when relatives, friends or an attorney representing the witness have come to the station to see and talk with the witness. (*Id.* at 587-89.) The practice of keeping witnesses in locked interview rooms and denying them access to relatives, friends, and attorneys is, according to the testimony of certain CPD personnel, in part to build rapport with the witnesses, and to protect the witness's identity in case of retaliation, as well as to protect the integrity of the investigation. (*Id.* at 598, 615-17, 640.)

At the time this lawsuit was filed on April 15, 2005, the only written policy in the CPD providing guidance on the treatment of witnesses was Detective Division Special Order 99-2 ("Special Order 99-2") (Pl. Ex. 4). The stated purpose of Special Order 99-2 is to ensure the safety and security of the Detective Division facilities. (*Id.* at 1.) In reference to witnesses, Special Order 99-2 advises officers to thoroughly search all witnesses before securing them in an interview room and remove items that could either inflict injury or cause damage to the facility. (*Id.* at 2.) Items often removed from witnesses included cell phones, belts, and shoelaces. (Hr'g

Tr. at 575-76.) Special Order 99-2 also states that witnesses must be accompanied at all times when they are not secured in an interview room. (Hr'g Tr. at 583-84; Pl. Ex. 4 at 1.)

As the hearing progressed and the court tried to encourage settlement, the City recognized that improvements were needed in the manner the CPD treated witnesses at police stations. CPD Superintendent Cline through general counsel of the CPD, Sherri Mecklenberg, stated:

> We believe that our accountability to the community and our attempt to develop trust and rapport with our witnesses would be best served by an internal policy that is better than what we have now, whether it's required by the law or not. (Hr'g Tr. at 824.)

CPD General Counsel Mecklenberg then presented a single page document that set forth the terms of a proposed CPD special order and described a proposed training video for the CPD regarding the proposed CPD internal policy of which she spoke. The document containing the proposed special order terms was marked and admitted in evidence as Plaintiffs' Exhibit 47.[2] General Counsel Mecklenberg also stated that "this proposed special order and a training video is really not necessarily only in settlement of this case. If the plaintiffs walk away from it, we still are going to do it." (Hr'g Tr. at 824.) The CPD General Counsel Mecklenberg's promise of implementation was reiterated to the court by the City's lead trial counsel, Sara Ellis, who stated:

> Also, as Ms. Mecklenberg stated to the Court and then stated to plaintiffs' counsel, we fully intend to implement the special order that she presented to the court.

(Hr'g Tr. at 831.)

The promised special order (Pl. Ex. 47) provides for an "oral witness advisory [by CPD

---

[2] Because injunctive relief is forward-looking, *O'Sullivan v. City of Chicago*, 396 F.3d 843, 857-858 (7th Cir. 2005), the proposed special order and statements by the CPD that it intends to implement the policy set forth in the proposed special order (Pl. Ex. 47) regardless of the litigation's outcome are certainly facts this court should consider in connection with the plaintiffs' motion for class certification.

4

personnel] as soon as practicable and in all cases within a reasonable time." Under the promised special order, detectives will document the reading of the advisory to each witness. Also, according to the terms of the promised special order, the time period established for CPD personnel to give each witness the advisory is the later of either the first hour of the interview by investigating detectives, or if the interview is delayed by the necessity of other investigation in the same case, then within the first three hours of the witness waiting to be interviewed. The language of the oral advisory to be given by CPD personnel to each witness as stated in the promised special order (Pl. Ex. 47) is as follows:

1. You are here as a witness because we need your help.
2. We ask that you stay here as long as is reasonably necessary to help us.
3. You are free to leave at any time.
4. But we depend upon the help of witnesses like you to solve crimes and prevent future crimes.

(Pl. Ex. 47.) The promise special order would also provide "for the relative comfort of the witness, including bathroom access and food and drink, on a reasonable basis." (*Id.*)

Additionally, the following seven witnesses testified at the hearing or by deposition to being held against their will at the police station for interviews by CPD personnel: named plaintiff Kyle Davis, named plaintiff Ramon Ayala, Josephina Rodriguez, Gail Johnson, Candice McGee, Natalie McFall, and Federick Tarver. Two of the witnesses, McFall and Johnson, testified to events occurring more than two years before the filing date of this lawsuit. (Hr'g Tr. at 476, 835.) With the exception of Ayala, (Dkt. No. at 1082), there was no evidence presented that the CPD had probable cause, or even reasonable suspicion, to detain any of these witnesses.

The witnesses were kept at Chicago area police stations overnight for periods ranging from 18 hours to 50 hours. (Hr'g Tr. at 105, 266, 411, 476, 839.) The witnesses were held in

5

locked interview rooms for most of the time that they spent at the police station. The witnesses uniformly testified that the police officers ignored their several requests to leave (*id.* at 150, 274, 277, 295, 416, 433, 437, 486, 845; Tarver Dep. at 24-25, lines 23-17) and that they received minimum amounts of food and drink (*id.* at 135-36, 298, 303, 312, 427, 485, 853; Tarver Dep. at 20, lines 14-22). The testimony of the witnesses also revealed individual differences with regard to their respective interactions with the individual detectives, the food and drink they each received during their stay at the police station, their requests to use the bathroom or the phone, and the criminal investigations in which they each were witnesses.

This court turns specifically to the testimony of the two named plaintiffs, Kyle Davis and Ramon Ayala. Davis testified that he was locked in an interview room for 28 hours from 2:15 p.m. on May 30, 2005 to 6:00 p.m. on May 31, 2005, except when he was occasionally taken to an empty office and questioned. (Hr'g Tr. at 105, 107, 116.) During his 28-hour stay, Davis intermittently asked if he could go home and stated multiple times that he was ready to go home. (*Id.* at 114, 117, 122-23, 137, 139.) Each time, Davis was told that he could not go home until a particular event happened, i.e., Davis answered some more questions (*id.* at 117, 129), he gave a Bucal swab (*id.* at 123), the test results for the swab came back (*id.* at 127), he was fingerprinted (*id.* at 128), he participated in a lineup (*id.* at 137-38), or he took a polygraph (*id.* at 139-40). Despite agreeing to each request, Davis was only released after telling officers that he needed to go to work. (*Id.* at 146-47.) The only food Davis had to eat during his stay were cookies at 1:00 a.m. on May 30 bought by a detective from the vending machine and cold spaghetti as well as cold ribs that the same detective also brought the second day. (*Id.* at 135-36.) Detective Parks, who was mostly responsible for questioning Davis, denied that Davis ever asked to leave. (Hr'g

Tr. at 1305; Parks Dep. at 59-60, lines 23-7.)

In contrast to Davis and the other members of the putative class, plaintiff Ramon Ayala was originally brought to the station around 11:00 a.m. on April 3, 2005, as a suspect in a murder investigation. (Hr'g Tr. at 189, 1074, 1082.) Detective Kevin Bor, who was investigating the case, believed he had a probable cause to arrest Ayala, although Detective Bor never filed an arrest report. Additionally, before questioning Ayala, Detective Bor read Ayala his *Miranda* rights. (*Id.* at 1082.) Only after Ayala began cooperating with the detectives during the morning of April 4, 2005, did he become a witness. (*Id.* at 1086.) Ayala eventually left the police station on April 5, 2005 at 2:00 or 3:00 p.m. (*id.* at 211), after taking a polygraph examination, (*id.* at 209), giving his statement to the state's attorney (*id.* at 215-16), and testifying in front of the grand jury (*id.* at 218). In total, Ayala spent a total of 50 hours locked at the police station. (*Id.* at 219.) Additionally, no one informed Ayala that his mother, sister, and an attorney seeking to represent him had come to the station to try to see him. (*Id.* at 219.) Ayala was eventually released after a signing a statement and testifying before the grand jury. (Hr'g Tr. at 216-18; Pl. Ex. 7.) Confirming that he signed a statement with the state's attorney, attesting that he had been treated well the officers, Ayala explained that he felt he had no other choice. (Hr'g Tr. at 216-18; Pl. Ex. 7.)

## STANDARD

A court has broad discretion to determine whether class certification is appropriate under Federal Rule of Civil Procedure 23. *Chavez v. Ill. State Police*, 251 F.3d 612, 629 (7th Cir. 2001). As prerequisites for certification, the potential class must satisfy the following criteria: (1) numerosity; (2) commonality of facts and law; (3) typicality between the class claims and

those of the named parties; and (4) adequacy of the representation by the named parties and class counsel. Fed. R. Civ. P. 23(a). In addition, because the plaintiffs are seeking to certify a class under Rule 23(b)(2), they also must establish that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Failure of the potential class to satisfy any one of these prerequisite elements precludes class certification. *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993); *Rahim v. Sheahan*, No. 99 C 0395, 2001 WL 1263493, *9 (N.D. Ill. Oct. 19, 2001). In deciding whether the party seeking class certification has met its burden of demonstrating that certification is appropriate, the court should make whatever factual and legal inquiries are necessary under Rule 23. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). The decision to certify a class does not depend on the strengths or weaknesses of the asserted claims, but instead on whether the potential class satisfies the requirements under Federal Rule of Civil Procedure 23. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).

ANALYSIS

The plaintiffs contend that class members were and will be unconstitutionally held or seized at Chicago area police stations in violation of the Fourth Amendment without probable and against their will. According to the plaintiffs, the CPD does and will commit those constitutional violations pursuant to the current policies, customs, or widespread practices of the CPD. To summarize, the challenged policies and practices include (1) searching witnesses thoroughly and removing personal items; (2) locking witnesses in interview rooms of the same type used for suspects for periods of time commonly exceeding 24 hours; (3) limiting witnesses

8

access to the bathroom and the telephone; (4) providing inadequate amount of food and drink; (5) failing to inform the witnesses that their relatives or lawyers were at the station; and (6) refusing the witnesses' requests to leave the station. This court also takes into account the promised special order (Pl. Ex. 47) of advising witnesses that they are free to leave.

A.  Numerosity

In challenging the plaintiffs' ability to satisfy the numerosity requirement, defendants contend that the plaintiffs have failed to present a sufficient number of witness class members who were not free to leave the police stations. (Dkt. No. 65 at 3-5.) Additionally, the defendants assert, any allegation that potential class members will be held against their will in the future is speculative. (*Id.* at 6.)

The defendants' focus, however, is misdirected. The relevant inquiry for determining whether there was a seizure under the Fourth Amendment is whether a reasonable person in the position of the witness would believe that he or she was free to leave the police station. *See United States v. Mendenhall*, 446 U.S. 544, 552-54 (1980); *United States v. Hendricks*, 319 F.3d 993, 1000 (7th Cir. 2003).

For the purposes of the class action litigation, the plaintiffs are contending that the policies, customs, and widespread practices of the CPD result in the unconstitutional seizure of witnesses without probable cause. Because this court does not determine the merits of these claims when addressing class certification, *Szabo*, 249 F.3d at 675, the plaintiffs must only establish for the purposes of numerosity, that a sufficient number of witnesses to make joinder impracticable are or will be subject to these allegedly unconstitutional policies. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 663-64 (7th Cir. 2004) (numerosity satisfied with class so

9

numerous as to make joinder impracticable).

Joinder is presumed impracticable for a class of 40 or more members. *Muro v. Target Corp.*, 2005 WL 1705828, *13 (N.D. Ill. July 15, 2005). As stipulated by the parties, 100 people in 28 randomly chosen investigations of first degree murders were interviewed at one of the Chicago Police Department's area stations during January 2004 to July 2005, and thus were subject to the policies, customs, and widespread practices of the CPD with regard to the treatment of witnesses held at Chicago area police stations. This class size satisfies the numerosity requirement, although, in recognition of the statute-of-limitations defense raised by the defendants, this court will exclude from the class all those—such as McFall and Johnson—with claims that occurred more than two years before the April 5, 2005, filing of the complaint. *See Jogi v. Voges*, 425 F.3d 367, 386 (7th Cir. 2005) (§ 1983 claims in Illinois have a two-year statute of limitations).

B. <u>Commonality</u>

The defendants, in arguing that the putative class cannot satisfy the commonality requirement, continue to focus on the fact-based, individual nature of an alleged injury under the Fourth Amendment. Commonality is usually satisfied where there is a common nucleus of operative fact, such as the defendant's engagement in standardized conduct toward potential class members. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Because the putative class presented evidence of the existence of policies and practices that they challenge as unconstitutional, as opposed to individual behavior of officers, this court concludes that the alleged unconstitutional conduct at issue is standardized toward the putative class and constitutes a common nucleus of operative fact sufficient for commonality. Furthermore, in this case, the

putative class seeks only injunctive relief and incidental costs and attorneys' fees; in contrast, compensatory damages for plaintiffs claiming a past violation of their Fourth Amendment rights would necessarily entail a fact-based analysis where individual issues predominate over common ones. Class members are not asserting these claims for monetary damages, nor could they.

C. Typicality and Adequacy

There is an issue that must be addressed with regard to named plaintiff Ayala's ability to adequately represent the class. This court analyzes the typicality and adequacy of representation requirements together because that analysis in this case blurs. *See Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999) (typicality is really an aspect of adequacy). One premise of the class's Fourth Amendment claim is that the police officers have no legal justification, such as probable cause or even reasonable suspicion, to hold the witnesses against their will at the police station. At the hearing, however, there was uncontradicted testimony by Detective Kevin Bor that Ayala was originally brought to the station and detained there based on probable cause. There is no Fourth Amendment violation where an individual is seized on the basis of probable cause. *Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004). Furthermore, suspects and witnesses have different rights when detained. *See First Legal Defense Aid v. City of Chicago*, 319 F.3d 967, 970 (7th Cir. 2003). Unlike the other class members, Ayala as a suspect was not in fact free to leave. *Id.* Only when he later became a witness could he exercise that right. *Id.* Because Ayala did not suffer the same injury as the putative class, his claims are not typical of his class, and he cannot adequately represent the class. *See E. Texas Motor Freight Sys., Inc., v. Rodriguez*, 431 U.S. 395, 403 (1977) (class representative must possess the same interest and suffer the same injury as class members); *see*

*also Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th 1995) ("A decision that the claim of the named plaintiffs lacks merits ordinarily, though not invariably . . . disqualifies the named plaintiffs as proper class representatives.")

That said, this court's conclusion with regard to Ayala is not fatal to class certification because Davis, the other named plaintiff, has asserted claims typical of the class and is an adequate representative. *See Robinson*, 167 F.3d at 1158 (suitability of new class representative must be determined independently of former proposed class representative found to be inadequate); *Cowen*, 70 F.3d at 941 (disqualification of the named plaintiff moots question whether to certify class unless lawyers for class find another representative). Evidence was presented that Davis was held as a witness for 28 hours against his will and without probable cause pursuant to the polices and practices of the CPD. Furthermore, Davis has standing to seek injunctive class relief. Although not currently detained, Davis was being held at the police station when he was named a plaintiff to this suit. When a claim is capable of repetition, yet evading review, the named plaintiff may litigate the class certification issue despite loss of his personal stake in the litigation's outcome, particularly in this circumstance where the claims are "inherently transitory." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398-99 (1980); *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11 (1975) (assuming named plaintiffs were no longer in custody awaiting trial when certifying class of pretrial detainees).

This court also addresses whether class counsel are adequate representatives and conclude that they are. From what this court witnessed during the hearing and settlement talks, there is no reason to believe that the class attorneys are not fully capable of representing the class or, as the defendants argue, that the class attorneys' allegedly "ideological agenda" (Dkt. No. 65 at 14 n.48)

in bringing this litigation is harmful or contradictory to class interests. Having determined that the class satisfies the prerequisites under Rule 23(a), this court proceeds to analyzing the claim under Rule 23(b)(2).

E. Rule 23(b)(2)

Plaintiffs have sought class certification only pursuant to Rule 23(b)(2). Certification under Rule 23(b)(2) is invoked where injunctive and declaratory relief are the primary or exclusive remedy sought and monetary damages are only incidental. *See In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005). The complaint recognizes these limitations, and appropriately limits the class relief sought to injunctive relief plus costs and attorneys' fees. Only the named individuals seek compensatory damages.

As previously discussed with regard to numerosity and commonality, the putative class challenge the policies and practices of the CPD and presented evidence at that hearing that there are standard procedures with regard to the treatment of witnesses. Because the policies and practices are conduct generally applicable to all potential class members, class certification for injunctive relief is appropriate.

## CONCLUSION

The plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23(b)(2) for injunctive relief (Dkt. No. 7) is granted. This court certifies Kyle Davis as the class representative. This court appoints the plaintiffs' counsel as class counsel. The class claim is whether there are policies, customs, or widespread practices of the Chicago Police Department with regard to holding witnesses against their will and without probable cause at Chicago police stations, and whether those policies, customs, or widespread practices violate the Fourth Amendment. The class is defined as:

A class for injunctive relief consisting of all persons, who (1) since April 5, 2003, (2) are believed by the CPD to be witnesses to criminal conduct, (3) who are detained by CPD personnel at a CPD police station against their will, and (4) who the CPD does not have a legally sufficient reason to detain.

Entry of judgment on the motion for preliminary injunction will be forthcoming, and future scheduling dates will be set in that memorandum opinion and order.

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATE: November 14, 2005