# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RAMON AYALA and KYLE W. DAVIS, individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO, a municipal corporation, and PHIL CLINE, Superintendent of the Chicago Police Department<br><br>Defendants. | No. 05 C 1967 |

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

JAMES F. HOLDERMAN, District Judge:

On June 18, 2005, plaintiffs Ramon Ayala ("Ayala") and Kyle W. Davis ("Davis") filed a second amended complaint under 42 U.S.C. § 1983 against the City of Chicago ("City") and Superintendent of Police Phil Cline ("Cline") on behalf of themselves and a purported class of other similarly situated individuals. (Dkt. No. 35.) In that complaint, the plaintiffs alleged that the Chicago Police Department ("CPD") has an unconstitutional custom or practice of holding witnesses against their will without probable cause in violation of the Fourth Amendment. (Dkt. No. 35.) The court has certified under Federal Rule of Civil Procedure 23(b)(2) a class for injunctive relief in a separate memorandum opinion and order issued today. Before this court is the plaintiffs' motion for preliminary injunction against the CPD practice that allegedly violated the Fourth Amendment. (Dkt. No. 9.) For the reasons stated below, this court denies the motion.

BACKGROUND

From October 3, 2005 through November 2, 2005, the court conducted a multi-day evidentiary hearing as to the plaintiffs' motion for preliminary injunction. (Dkt. No. 9.) At that hearing, testimony was provided by persons who were allegedly held against their will without probable cause at certain Chicago police stations. CPD supervisory personnel and detectives also testified. Other witnesses were called by the parties including expert witnesses for each side. Additionally, numerous exhibits were presented for the court's consideration.

A.  Evidence Regarding Practices of the Chicago Police Department

Both sides agree that it would be unlawful to have any witness taken to a police station without the witness's consent or without probable cause to arrest the witness. The evidence presented at the preliminary injunction hearing establishes that it is the practice of the CPD that when persons who have witnessed criminal conduct are taken to police stations, they are generally placed in small windowless rooms, which are the same rooms used by CPD personnel to interrogate criminal suspects. (Hr'g Tr. at 567-69.)[1] These interview rooms typically have only one door that locks from the outside. (Hr'g Tr. at 569, 571; Pl. Ex. 6, 6(a).) Generally, each room has a metal bench bolted to the floor or wall. (Hr'g Tr. at 570; Pl. Ex. 6.) The walls are typically made of cinder block material and have metal rings, to which handcuffs may be attached, affixed to the walls. (Hr'g Tr. at 570; Pl. Ex. 6.) The fluorescent lights in the ceiling of

---

[1] The court has referred to the pages of the hearing transcript that have been prepared by the official court reporter at the request of counsel for the parties. Before the hearing was completed, counsel for the parties withdrew their request of the court reporter for preparation of transcripts of the hearing. Consequently, finalized pages of the hearing transcript after page 1426 on October 19, 2005 have not been prepared at this time and could not be specifically cited herein.

the interview rooms are controlled by a switch located outside the room. The rooms have no clock, no toilet, and no running water. (Hr'g Tr. at 572.)

It is not uncommon for a witness to stay in the CPD police station interview rooms for longer than 24 hours. (*Id.* at 580; Molloy Dep. at 82, line 5-8.) With the exception of the CPD Area 2 station, witnesses are always locked in the interview rooms while waiting to answer detectives' questions. (Hr'g Tr. at 667.) Witnesses are told to knock on the locked door and someone will assist them if the witnesses need anything, including use of the bathroom facilities or food and drink. (*Id.* at 584-85.) Detectives who voluntarily provide food and drink to witnesses are not reimbursed for the cost. (*Id.* at 586.)

A witness, while at the police station, is typically not informed by the CPD when relatives, friends or attorneys representing the witness have come to the station to see and talk with the witness. (*Id.* at 587-89.) The practice of keeping witnesses in locked interview rooms and denying them access to relatives, friends, and attorneys is, according to the testimony of certain of the CPD personnel, in part to build rapport with the witnesses and to protect the witness's identity in case of retaliation as well as to protect the integrity of the investigation. (*Id.* at 598, 615-17, 640.) The former CPD chief of detectives, Deputy Superintendent James F. Molloy, and the current CPD coordinator of training, Sergeant Joseph Mosely, each testified that under CPD policy witnesses are always free to leave, but that the CPD has no written policy directing CPD personnel to inform witnesses of that right. (*Id.* at 567, 590, 707.) Detectives are trained that, although witnesses are free to leave the police station at any time, detectives may use persuasion to convince witnesses to stay. (*Id.* at 600, 707-09.) Detectives generally do not inform witnesses that their cooperation with CPD personnel is voluntary and that the witnesses

3

are free to leave at any time.

At the time the lawsuit was filed on April 5, 2005, the only written policy in the CPD providing guidance as to the treatment of witnesses was Detective Division Special Order 99-2 ("Special Order 99-2"). (Pl. Ex. 4.) The stated purpose of Special Order 99-2 is to ensure the safety and security of the Detective Division facilities. (*Id.* at 1.) In reference to witnesses, Special Order 99-2 advises officers to thoroughly search all witnesses before securing them in an interview room and to remove items that could either inflict injury or cause damage to the facility. (*Id.* at 2.) Items often removed from witnesses include cell phones, belts, and shoelaces. (Hr'g Tr. at 575-76.) Special Order 99-2 also states that witnesses must be accompanied at all times when they are not secured in an interview room. (*Id.* at 583-84; Pl. Ex. 4 at 1.)

As the preliminary injunction hearing progressed and the court tried to encourage settlement, the City recognized that improvements are needed in the manner CPD personnel treated witnesses at police stations. CPD Superintendent Cline through CPD General Counsel Sherri Mecklenberg stated:

> We believe that our accountability to the community and our attempt to develop trust and rapport with our witnesses would be best served by an internal policy that is better than what we have now, whether it's required by the law or not. (Hr'g Tr. at 824.)

CPD General Counsel Mecklenberg presented a single page document that set forth the terms of a proposed CPD special order and described a proposed training video for the CPD regarding the proposed CPD internal policy of which she spoke. (Hr'g Tr. at 826.) The document containing the proposed special order terms was marked and admitted in evidence as Plaintiffs' Exhibit 47. (*Id.* at 992-94.) General Counsel Mecklenberg also stated to the court that "this proposed special order and a training video is really not necessarily only in settlement of

4

this case. If the plaintiffs walk away from it, we [members of the CPD] still are going to do it."

(Hr'g Tr. at 824.) The CPD General Counsel Mecklenberg's promise of implementation was reiterated to the court by the City's lead trial counsel, Sara Ellis, who stated:

> Also, as Ms. Mecklenberg stated to the Court and then stated to plaintiffs' counsel, we fully intend to implement the special order that she presented to the court.

(Hr'g Tr. at 831.)

The promised special order (Pl. Ex. 47) provides for an "oral witness advisory [by CPD personnel] as soon as practicable and in all cases within a reasonable time." Under the promised special order, detectives will document the reading of the advisory to each witness. Also, according to the terms of the promised special order, the time period established for CPD personnel to give each witness the advisory is the later of either the first hour of the interview by investigating detectives, or if the interview is delayed by the necessity of other investigation in the same case, then within the first three hours of the witness waiting to be interviewed. The language of the oral advisory to be given by CPD personnel to each witness as stated in the promised special order (Pl. Ex. 47) is as follows:

1. You are here as a witness because we need your help.
2. We ask that you stay here as long as is reasonably necessary to help us.
3. You are free to leave at any time.
4. But we depend upon the help of witnesses like you to solve crimes and prevent future crimes.

(Pl. Ex. 47.) The promised special order would also provide "for the relative comfort of the witness, including bathroom access and food and drink, on a reasonable basis." (*Id.*)

B. Testimony by Witnesses Questioned at Chicago Area Police Stations

The plaintiffs presented the testimony of seven individuals who were witnesses in

5

criminal investigations and brought to police stations for interviews by CPD personnel: Kyle Davis, Ramon Ayala, Josephina Rodriguez, Gail Johnson, Candice McGee, Natalie McFall, and Federick Tarver. With the exception of Ayala, whom the court has removed as a class representative, there was no evidence presented that the CPD had probable cause, or even reasonable suspicion, to support the detention of these witnesses. At the hearing, these witnesses were consistent in their testimony on certain key issues. The witnesses were kept at Chicago area police stations overnight for periods ranging from 18 hours to 50 hours. (Hr'g Tr. at 105, 265-66, 411, 476, 839.) The witnesses were held in the locked interview rooms for most of the time that they spent at the police station. When the witnesses became hungry, they had to ask detectives for food and drink and were only fed sporadically during the time spent at the stations. (*Id.* at 135-36, 298, 303, 312, 427, 485, 853; Tarver Dep. at 20, lines 14-22.) Use of the bathroom or any other request required that the witness knock on the locked door until CPD personnel outside the interview room responded. (Hr'g Tr. at 279, 303, 422, 481, 844; Tarver Dep. at 17-18, lines 20-6.) The plaintiff witnesses were not informed if their lawyers or relatives had come to the station and attempted to see them. (Hr'g Tr. at 219, 440, 442.)

The individual witnesses uniformly attested that detectives refused their several requests to leave the police station. (Hr'g Tr. at 150, 274, 277, 295, 416, 433, 437, 486, 845; Tarver Dep. at 24-25, lines 23-17.) According to the plaintiff witnesses, the detectives with whom they dealt typically told them in response to the witnesses' requests to leave that they could not go until a particular event occurred. Examples of such events include answering more questions (Hr'g Tr. at 117, 129, 274, 486), submitting a Bucal swab for DNA or being fingerprinted (*id.* at 123, 128), taking a polygraph examination (*id.* at 139, 295), giving a statement to the state's attorney (*id.* at

315, 486), and testifying before the grand jury (*id.* at 854.) Equally as uniformly, testifying CPD detectives assigned to each investigation denied at the preliminary injunction hearing that these witnesses requested to leave the police station. (Hr'g Tr. at 789, 1088-89, 1101, 1148, 1239, 1305, 1404.) Certain plaintiff witnesses who gave written statements to the state's attorney or testified before the grand jury stated that they had been treated well by the police; the plaintiff witnesses explained that they gave that testimony because they felt they had no other choice. (*Id.* at 216, 218, 309, 489, 852, Pl. Exs. 7-10.)

The credibility of other witnesses for both sides was attacked by opposing counsel, sometimes effectively.[2] The question of who among these witnesses was telling the truth was a difficult one to answer because both the plaintiff witnesses and the CPD detectives each had clear motives to shade their testimony in their own favor, and the court believes some appeared to do so while testifying at the hearing. The court has considered this evidence and endeavored to discern the truth with regard to the facts. Ultimately, however, this court need not decide whether the police officers or the plaintiff witnesses were testifying truthfully because this

---

[2] Both sides also presented expert witnesses, Dr. Norman Stamper for the plaintiffs and Mr. Ronald B. Freeman for the defendants. The defendants filed a *Daubert* motion challenging the testimony of the plaintiffs' expert, Dr. Stamper. This court did not rely on the testimony of either witness. This court determined that Dr. Stamper's testimony was irrelevant. His testimony focused on what he believed to be better police practices. (Hr'g Tr. at 954.) The issue in this case, however, is whether the CPD's police practices are unconstitutional, not whether they could be improved. Because this court did not rely on Dr. Stamper's testimony, it is unnecessary to decide the defendants' *Daubert* motion.

Although Mr. Freeman's testimony was not subject to a *Daubert* challenge, this court found his testimony unreliable with regard to proper police procedure. Mr. Freeman testified that he was not familiar with the *Brady v. Maryland* case and displayed no understanding of the due process concept presented in that case. When a police officer and a police commander in Pittsburgh, he testified that there were times that he intentionally did not prepare written reports so that he would not have to turn the reports over to defense counsel.

7

court's decision rests on the promised special order (Pl. Ex. 47) introduced in the middle of the hearing.

## STANDARD OF PROOF

To prevail on a motion for preliminary injunction, the moving party must show (1) a reasonable likelihood of success on the merits, (2) irreparable harm if the injunction is not granted, and (3) no adequate remedy at law. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). After examining these factors, the court must balance the potential harms to the plaintiffs and defendants and must also consider the public interest. *Lucini Italia Co. v. Grappolini*, 288 F.3d 1035, 1039 (7th Cir. 2002). Plaintiffs need only establish a "better than negligible chance of succeeding" on the merits, but it must be by a clear showing of evidence. *Chicago Dist. Council of Carpenters Pension Fund v. K & I Construction, Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001).

## ANALYSIS

A.  The Effect of the CPD Proposed Special Order on Motion for Preliminary Injunction

At the beginning of the hearing, the plaintiff class's legal stance was that (1) Chicago police officers unconstitutionally held witnesses at police stations against their will without probable cause in violation of the Fourth Amendment, and (2) the witnesses were unconstitutionally detained pursuant to widespread practice amounting to a custom. To establish the existence of a custom or widespread policy, the plaintiffs presented evidence regarding the length of time witnesses stay at police stations, the CPD's policy of locking witnesses in the same type of rooms used to hold suspects, the CPD's policy of searching witnesses and removing personal items, and the CPD's policy of not informing witnesses that their attorney or relative

8

had arrived at the police station, in addition to testimony that the witnesses' requests to leave were rebuffed and they were not provided sufficient food, drink, and bathroom use. As discussed above, during the course of the hearing, the City and Superintendent Cline through his counsel stated on the record that the CPD planned to implement an internal policy of advising witnesses at police stations that they are free to go and of providing on a reasonable basis food, drink, and bathroom use. (Hr'g Tr. at 824; 831; Pl. Ex. 47.)

Because injunctive relief is forward-looking, *O'Sullivan v. City of Chicago*, 396 F.3d 843, 857-858 (7th Cir. 2005), this court may consider the promised special order (Pl. Ex. 47) as well as the representations to this court by CPD General Counsel (Hr'g Tr. at 824) and the City's lead trial counsel (*id.* at 831) that the CPD intends to implement the policy set forth therein regardless of this litigation's outcome. The City and Superintendent Cline's promise to implement the policy does not, however, moot the class's demand for preliminary injunction. *See Walsh v. U.S. Dep't of Veteran Affairs*, 400 F.3d 535, 537 (7th Cir. 2005) (voluntary cessation of an alleged wrong moots injunctive relief claim if there is no reasonable expectation that alleged wrong will be repeated); *Milwaukee Police Assoc. v. Jones*, 192 F.3d 742, 747 (7th Cir. 1999). There has been no evidence that the promised special order (Pl. Ex. 47), that the court trusts the CPD will implement, has as of yet been implemented, and so at this time it remains only a promise of future action by CPD. *See Owner-Operator Indep. Drivers Assoc., Inc., v. Allied Van Lines, Inc.*, No. 04 C 3207, 2005 WL 1269904, *3 (N.D. Ill. May 23, 2005) ("Mooting a claim for injunctive relief is not a simple matter of assuring the court that change is on the way."). In addition, the plaintiffs argue that, even with a policy of advising witnesses of their right to leave and reasonable access to food, drink, and bathroom use, the CPD's

9

policies—i.e., locking witnesses in interview rooms, searching witnesses and removing personal items, not informing witnesses that their lawyers or relatives had arrived, and keeping witnesses in the interview rooms often overnight and for long amounts of time—still amounts to a policy, custom, or widespread practice that violates the Fourth Amendment rights of witnesses.

B. Reasonable Likelihood of Success on the Merits

To prevail, the plaintiffs initially needed to establish that the CPD had a policy, custom, or widespread practice under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 653 (1978) of violating the Fourth Amendment rights of witnesses. The introduction into evidence of the promised special order (Pl. Ex. 47), proposed and authorized by the Superintendent, resolves the first question of whether the plaintiffs can establish a policy and practice under *Monell*. The promised special order (Pl. Ex. 47) satisfies the requirements under *Monell*. Superintendent Cline, a person with final decision-making authority, was responsible for initiating this promised special order, and the plaintiffs challenge that promised policy as insufficient to prevent constitutional injury to the plaintiff witnesses. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

The law is clear that the detention of a person by the police without probable cause is unlawful under the Fourth Amendment when an officer by means of physical force or a show of authority has restrained the liberty of an individual, and a reasonable person would not believe that the individual is free to leave. *United States v. Mendenhall*, 446 U.S. 544, 552-54 (1980); *Terry v. Richardson*, 346 F.3d 781, 785 (7th Cir. 2003). Whether a reasonable person would feel free to leave is determined by a totality of circumstances, weighing such factors as the threatening presence of several officers, the display of a weapon by an officer, the physical

touching of the individual, a request that an individual accompany the officer to a police station or police room, the use of language or tone of voice that indicates compliance might be compelled, and whether an individual was told he was free to go. *Mendenhall*, 446 U.S. at 554; *United States v. Hendricks*, 319 F.3d 993, 1000 (7th Cir. 2003); *United States v. Sheets*, 188 F.3d 829, 837 (7th Cir. 1999); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1178 (7th Cir. 1994). Even though courts may consider whether a witness was advised that he was free to go, Fourth Amendment jurisprudence does not mandate such warnings. *See Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973).

The class in this case is defined as comprised of individuals believed by the CPD to have witnessed criminal conduct, who the CPD personnel does not have probable cause to hold and who are interviewed and held without their consent or for a time period beyond that which the witness consents to stay at police stations. Any detention of such individuals by the CPD would violate Fourth Amendment. *See Dunaway v. New York*, 442 U.S. 200, 216 (1979); *A.M. v. Butler*, 360 F.3d 787, 798 (7th Cir. 2004).

The plaintiffs contend that, even with an oral advisory informing witnesses that they are free to leave the police station, witnesses treated in accordance with the practices of the CPD would still not believe that they could in fact exercise that right to leave. In support, the plaintiffs emphasize that witnesses were locked inside almost barren, cinder block interview rooms for long periods of time, that the witnesses only sporadically received food, drink, and bathroom use, and that the witnesses were not told that their lawyers or relatives were at the station.

This court disagrees. The relevant question is whether a witness reasonably believes that

11

he or she is free to leave and could in fact leave. If a witness understands that he or she is free to leave, there is no constitutional violation in holding the witness in a locked interview room for long periods of time and not informing the witness that his or her lawyer or relatives are at the station. A witness who believes that he or she is free to leave and could in fact leave is choosing to stay at the police station and could choose to leave if the witness is not satisfied with his or her treatment. Furthermore, that a witness would voluntarily stay under these conditions is not beyond credible belief. An individual may wish to assist the police in investigating criminal conduct or clear his or her name and may recognize that criminal investigations can be inconvenient and time-consuming.

The planned implementation of the policy of advising witnesses that they are free to leave ensures that a witness understands his or her right to leave. The court believes that the promised CPD policy along the lines expressed in Plaintiffs' Exhibit 47 would alleviate the concerns identified by the plaintiffs about the conditions under which witnesses are held in Chicago police stations. Informed by the promised special order's advisory of his or her rights, a witness would be voluntarily choosing to remain in the police station under those conditions. There is no Fourth Amendment violation where a witness voluntarily consents to remain at the police station, even for long periods of time in locked interview rooms. In light of the proposed special order relating to advising witnesses of their right to leave and providing reasonable access to food, drink, and bathrooms, the plaintiffs have not established a reasonable likelihood that they could prove at a trial the opposite policy or practice of holding witnesses unconstitutionally against

their will.³ Moreover, despite the plaintiffs' request that the witnesses be told that their attorney or relative has arrived, there is not a constitutional requirement that a suspect, let alone a witness, be notified that his attorney is at the station if no request is made. *See Moran v. Burbine*, 475 U.S. 412, 425 (1986); *First Defense Legal Aid v. City of Chicago*, 319 F.3d 967, (7th Cir. 2003). This court finds that the plaintiffs have failed to establish that they have a reasonable likelihood of success on the merits.

C. Remaining Elements of Preliminary Injunctive Relief

The proposed special order also undercuts the plaintiff class's ability to demonstrate that they will continue to suffer irreparable harm if a preliminary injunction is not granted. The plaintiffs contend that the CPD's practices, despite the proposed special order and video training, still amount to the unconstitutional detention of witnesses and present a real and immediate threat of irreparable harm. But this court finds from the evidence presented at the hearing that the promised special order that CPD personnel advise witnesses of their right to leave the police station is all that is needed under the law to protect against possible future injury to members of the plaintiff class. *See Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (harm must be real and immediate). Furthermore, because it appears probable that future harm on a class-wide basis will be prevented through the implementation of the promised special order, money damages may suffice to compensate future harm, if any, suffered by any individual on an individualized basis. *Id.*; *Campbell v. Miller*, 373 F.3d 834, 835-36 (7th Cir. 2004). Thus, the plaintiffs cannot

---

³An oral advisory alone does immunize the CPD from challenges under the Fourth Amendment. This court can envision circumstances where, despite receiving the oral advisory, a reasonable person in the witness's shoes would not believe that he or she was free to leave. For the purposes of this case, however, the promised policy of giving an oral advisory alleviates the concerns raised by the plaintiffs.

establish that there is an inadequate remedy at law.

Finally, because this court concludes that the plaintiffs have not established that they will suffer irreparable harm absent the issuance of preliminary injunctive, little needs to be said about weighing the potential harm faced by each party resulting from this court's ruling. Moreover, this court wishes to reiterate its statement at the hearing that it does not wish to supervise the CPD's implementation of an internal policy. For now, this court accepts the CPD's word that it plans to institute the internal special order described in Plaintiffs' Exhibit 47 mandating the advising of witnesses at police stations of the right to leave, and that the planned special order will include language ensuring that witnesses be provided with food, drink, and bathroom use on a reasonable basis. For the purposes of the motion for preliminary injunction, the promised CPD special order eliminates the need for the court to grant the motion so long as the CPD implements the terms of the promised special order with reasonable promptness, substantially in the form as presented to the court in Plaintiffs' Exhibit 47.

## CONCLUSION

Having considered the evidence presented and for the reasons set forth above, this court denies the plaintiff class's motion for preliminary injunction (Dkt. No. 9) based upon Superintendent Cline's representation through CPD General Counsel Mecklenberg that the City will implement the terms of the promised special order and video training program substantially as set forth in Plaintiffs' Exhibit 47 because the CPD is "going to go ahead and do it to make [the CPD] a better police department." (Hr'g Tr. at 824.) Defendants' *Daubert* motion regarding Dr. Stamper (Dkt. No. 89) is moot.

Counsel are requested to hold a Rule 26(f) conference and file a jointly completed Form

35 signed by counsel for each party on or before December 6, 2005. Counsel are requested to submit a judge's copy of the Form 35 to Chambers on the day of filing. This case is set for a report on status and entry of a scheduling order at 9:00 a.m. on December 13, 2005. The parties are again encouraged to discuss settlement.

ENTER

*James F. Holderman*

JAMES F. HOLDERMAN
United States District Judge

DATE: November 14, 2005