**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KYLE DAVIS, individually and on behalf of a class of similarly situated persons, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 05 C 1967 |
| v. | ) ) | The Hon. James F. Holderman |
| CITY OF CHICAGO, a municipal corporation, and PHIL CLINE, Superintendent of the Chicago Police Department | ) ) ) ) | |
| Defendants, | ) ) | |

**MEMORANDUM IN SUPPORT OF THE PLAINTIFF
CLASS MOTION FOR PARTIAL SUMMARY JUDGMENT**

While this matter was before the Court for hearing on the plaintiff class motion for preliminary injunction, the Court – after hearing the testimony of several individuals who described the Chicago Police Department's treatment of them as "witnesses" at CPD facilities – encouraged the parties to explore whether this case could be settled. Settlement proved unattainable. But, on January 16, 2006, the City voluntarily implemented a new written protocol, Detective Division Special Order 06-01 (hereinafter, the "Special Order" or the "Order;" attached as Ex. G in support of the Plaintiff Class Motion for Partial Summary Judgment), which contains standard operating procedures for CPD detectives' treatment of witnesses.

The Special Order is constitutionally deficient on its face. In blatant violation of the Fourth Amendment, the Order explicitly authorizes detectives to seize witnesses without probable cause and hold them incommunicado in locked CPD interview rooms for periods of up to three hours. The facts regarding the facial unconstitutionality of the Special Order are not in

dispute and this Court should therefore enter partial summary judgment in favor of the plaintiff class with respect to the facial unconstitutionality of the Order.[1]

## THE UNDISPUTED FACTS[2]

**A.  This Court's Findings After The Preliminary Injunction Hearing.**

The plaintiff class presented evidence at a multi-day preliminary injunction hearing before this Court in October and November 2005 that the CPD had a practice of seizing and detaining "witnesses"[3] in homicide and other serious violent crime investigations against their will and without probable cause in violation of the witnesses' Fourth Amendment rights. At the hearing, seven individuals testified that they were detained against their will as witnesses in CPD homicide investigations. The Court also heard testimony from James Molloy, former CPD Chief of Detectives, and from Sgt. Joseph Moseley, the coordinator of training for CPD detectives.

Based in substantial part on the testimony of those high-ranking Police officers, the Court made findings regarding the CPD's practices for dealing with witnesses at Police facilities in homicide and other violent crime investigations. The findings are set forth in *Ayala, et al. v. City of Chicago, et al.,* No. 05 C 1967, Memorandum Opinion and Order Regarding Plaintiffs' Motion for Preliminary Injunction (N.D. Ill. November 14, 2005) (the "Opinion;" attached as Ex. B in support of the Plaintiff Class Motion for Partial Summary Judgment):

---

[1] The plaintiff class also maintains that the City's "new" policy for the treatment of witnesses is also unconstitutional in operation – because witnesses who should receive the CPD's new Witness Advisory often do not receive it in fact and because, even after the Advisory is given, witnesses who remain confined in locked CPD interrogation rooms are "seized" in violation of the Fourth Amendment. Those issues are not presented in this motion.

[2] This summary is drawn from findings of this Court following the preliminary injunction hearing, from the evidence at the hearing, from the defendants' documents and from the deposition testimony of Chief of Detectives Maria Maher. The class plaintiffs' Local Rule 56.1(a) Statement of Facts As To Which There Is No Genuine Issue provides sources for all of the plaintiffs' factual assertions.

[3] For simplicity and economy, the plaintiff class uses the term "witness" throughout this Memorandum to refer to a person who may have information concerning a serious crime but whom the Police do not have probable cause to arrest for that or any other offense.

- It is the practice of the CPD that when persons who have witnessed criminal conduct are taken to police stations, they are generally placed in small, windowless rooms, which are the same rooms used by CPD personnel to interrogate criminal suspects.  Ex. B at 2.

- These rooms typically have only one door that locks from the outside; they are generally furnished with a metal bench bolted to the floor or wall; the walls are typically made of cinder block material and have metal rings, to which handcuffs may be attached, affixed to the walls.  The fluorescent lights in the ceiling of the interview rooms are controlled by a switch located outside the room.  The rooms have no clock, no toilet, and no running water.  *Id.* at 2-3.

- With the possible exception of Area 2,[4] witnesses are always locked in the interview rooms while waiting to answer to detectives' questions.  *Id.* at 3.

- Pursuant to a written CPD directive, witnesses are to be "thoroughly searched" before being secured in an interview room and items the witnesses could use to harm themselves or others – typically shoelaces, belts and cell phones – are removed from the witnesses.  *Id.* at 4.

- It is not uncommon for witnesses to stay in the CPD police station interview rooms for longer than 24 hours.  *Id.* at 3.  Former Chief of Detectives, James

---

[4] The testimony regarding the practice at Area 2 was conflicting.  *Compare* the assertion of Deputy James Molloy (Transcript of Preliminary Injunction Hearing (excerpts from which are attached as Ex. A in support of the Plaintiff Class Motion for Partial Summary Judgement) at 637-38, 666 (doors to interview rooms holding witnesses at Area 2 are shut, not locked)) *with* the testimony of Det. Cedric Parks (Ex. A at 1317-18 (doors to interview rooms holding witnesses at Area 2 are locked as a matter of standard practice)).  During an off-the-record discussion, the Court was informed that the current CPD Chief of Detectives intends to instruct Area 2 command personnel that, henceforward, all witnesses at Area 2 shall be locked into interview rooms.  At her recent deposition, Maria Maher, the current Chief of Detectives confirmed that Area Two detectives, like all other CPD detectives, are trained and expected to lock witnesses inside police interview rooms whenever a detective is not also present in the room.  Transcript of Maria Maher's 6/7/06 Deposition at 149-51, excerpts of which are attached as Ex. C in support of the Plaintiff Class Motion for Partial Summary Judgment.

        Molloy, testified that from 2003 through May 2005, more than a hundred witnesses "very well could have" remained in locked police interview rooms for longer than 24 hours.  Ex. A at 580.

- Witnesses must be accompanied at all times when they are not secured in an interview room. Ex. B at 4.

- Witnesses, while at a Police area headquarters, are not typically informed when relatives, friends or attorneys representing the witnesses have come to the station to see and talk with the witness.  *Id.* at 3.

- The Police have no policy for reimbursing detectives who voluntarily provide food and drink to witnesses, and the witnesses who testified at the hearing were only fed sporadically after asking detectives for food and drink.  *Id.* at 3, 6.

- The evidence at the preliminary injunction hearing showed that CPD detectives, at that time, generally did not inform witnesses that their cooperation with the Police is voluntary and that the witnesses are free to leave at any time.  *Id*. At 3-

Although not noted in the Court's findings, Sgt. Joseph Moseley, the coordinator of training for CPD detectives, admitted that detectives are trained to "force or compel" reluctant witnesses to accompany the Police to area headquarters "against their will."  Ex. A at 714.

**B.**    **Events Surrounding Implementation of the Special Order.**

        In discussions with counsel during the course of the preliminary injunction hearing, the Court indicated that a constitutional problem with the CPD's treatment of witnesses might be avoided if the Police would adopt a policy of clearly advising witnesses at the outset that they are free leave the CPD facility.  Recognizing that its procedures for handling witnesses were in need of improvement (*see* Ex. B at 4), the Police implemented the Special Order, effective on January 16, 2006.

The decision to implement the Special Order was apparently made over internal dissent. Maria Maher, the current CPD Chief of Detectives who coordinated the creation, planning and implementation of the Special Order, requested written comment from high-ranking members of the Detective Division on an earlier concept for advising witnesses of their freedom to leave – under which witnesses would be so informed in a written consent form which they would sign. The ranking members' written comments provide candid, and revealing, criticism of any policy under which witnesses would be informed of their freedom to leave Police facilities.

For example, Yvonne Sutor, Commander of the Central Investigations Detail, stated: "The Witness Consent Form *can be misinterpreted by a witness to mean that they have a choice as to whether to cooperate*." (Emphasis added.) Commander Sutor continued: "[T]he form provides a false expectation of expedience by stating that a witness will stay as long as it is 'reasonably' necessary to help the police. *Witnesses are probably always kept longer than what any one of them would consider 'reasonable.'*" (Emphasis added.)

Area Four Commander Steve Peterson stated, "When [witnesses] are found by either the Detectives or Fugitive Team, *their motivation to provide information is for them to leave the Area when they are done*. In either case*, if they are given the option with the witness form, more often than not they will leave and once the word spreads, everyone will know about it and know they do not have to talk to the police*." (Emphasis added.)

Deputy Chief Michael Chasen bluntly summarized the extreme view within the CPD as to the "risk" of telling witnesses they do not have to remain at Police facilities for questioning: "The institution of a 'witness consent form' would sound a death knell to the Detective Division."

C.  **The Special Order: Timing and Other Requirements for the Giving of the "Witness Advisory."**

The Special Order appears to reflect a compromise between the need to correct the constitutional violation that was being demonstrated at the preliminary injunction hearing before this Court, on the one hand, and the views of senior members of the Detective Division, on the other. It is an unconstitutional compromise.

1.  **Other than creating a "Witness Advisory," the Special Order does not change established CPD practices regarding the treatment of witnesses in homicide and other serious violent felony investigations.**

Chief Maher made clear in her deposition that, with the exception of a sometimes-required "Witness Advisory," the Special Order has not altered the CPD's practices with regard to the treatment of witnesses in homicide and other serious violent crime investigations. *See* Ex. C at 70, 128-29. As before, witnesses continue to be held in CPD interview rooms on numerous occasions – and for similar lengths of time. *Id.* at 119, 159-60. The characteristics of the interview rooms have not changed. *Id.* at 111-14. As before, witnesses are "thoroughly searched" before being placed in these rooms, their belts, shoelaces and cell phones are removed and detectives are trained to lock the witnesses in the room whenever a detective is not present. *Id.* at 133, 136-37, 140-41, 144, 149-51.

Witnesses who want the opportunity to use the bathroom or telephone or who want something to eat or drink must knock on the door of the interview room to seek permission of a detective. *Id.* at 154. Witnesses are commonly denied access to a telephone – and may be denied such access even when they insist upon their need to use the phone. Transcript of Maria Maher's 7/19/06 Deposition at 40-44 (excerpts of which are attached as Ex. I in support of the Plaintiff Class Motion for Partial Summary Judgment). As before, CPD personnel commonly

prevent contact between a witness and the witness's family members, friends and/or attorney. *See* Ex. G at § VIII(A). Ex. I at 45, 48.

### 2. The Witness Advisory is only given to persons detained at CPD facilities in circumstances in which a reasonable person would not feel free to leave.

The only change in practice is the creation of the Witness Advisory, defined in the Special Order as "a statement by an officer which clearly advises the witness that he/she is free to leave." Ex. G at § IV (A). According to the Special Order, the Witness Advisory should convey the following information to a witness being questioned at a Police facility: "1. You are here as a witness because we need your help to solve a crime. 2. We are asking you to stay here as long as is reasonably necessary to help solve the crime. 3. You are free to leave when you want. 4. We depend upon the help of witnesses like you to solve crimes and prevent additional crimes." *Id*.

Not every witness being questioned at a Police facility is given the Advisory. Rather, a detective is required to given the Witness Advisory only when, in the terms of the Order, "*the circumstances surrounding a witness in a Police Facility are such that a reasonable person in the witness's position would have believed that he/she was not free to leave*." (Emphasis added.) Ex. G at V(D).

The CPD has issued a Training Bulletin to instruct detectives on the Special Order and the Department's expectations regarding the treatment of witnesses at Police facilities. The Training Bulletin clarifies that the Witness Advisory is to be given – *i.e.,* that a reasonable person in the witness's position would not feel free to leave – when the witness: (a) has been "guid[ed] to a police car" and driven to the area headquarters; (b) has had his cell phone taken away from him; (c) has been locked in an interview room "for several hours;" and (d) has banged

7

on the door but no one has answered.[5] *Ibid.* This scenario is strikingly similar to the treatment that preliminary injunction witnesses Kyle Davis, Ramon Ayala, Josephina Rodriguez, Candice McGee, Gail Johnson, Natalie McFall and Frederick Tarver described receiving at the hands of the CPD.[6]

### 3. Witnesses may be held for three hours before receiving the Witness Advisory.

Under the Special Order, the Advisory need not be given upon arrival at the Police station to witnesses who are to be detained in circumstances in which a reasonable person would not feel free to leave. Instead, the Special Order provides that, if a detective's interview with a witness has been delayed "due to the course of the investigation," the detective need only give the Witness Advisory "within the first three hours of the witness's presence in the Police Facility." Ex. G at § V(D).

As Chief Maher admitted in her deposition, CPD policy as expressed in the Order permits detectives to leave witnesses in circumstances in which a reasonable person would not believe he was free to leave for a maximum of three hours before the detective is required to *tell* the witness that he *is* free to leave. Ex. C at 194. Chief Maher acknowledged that the CPD so trains its detectives. *Id.* at 185. A CPD Training Bulletin promulgated to provide instruction on the Special Order makes it perfectly clear detectives that witnesses may be left, without receiving any advisory, for up to three hours in circumstances in which a reasonable person would feel that he was not free to leave. *See* Detective Division Training Bulletin entitled "Treatment of

---

[5] In her deposition, Chief Maher said that the Witness Advisory must be given to a witness who meets the criteria set forth in the preceding paragraph, even if, when the witness bangs on the interview room door, a detective *does* respond to the witness and complies with the witness's request to be escorted to the bathroom. Ex. C at 181-82.

[6] The Plaintiff Class Local Rule 56.1(a)(3) Statement of Facts As To Which There Is No Genuine Issue (at ¶ 38) summarizes the treatment these seven individuals claimed in their preliminary injunction hearing testimony that they endured as a "witness" in a CPD homicide investigation.

Witnesses," attached as Ex. H in support of the Plaintiff Class Motion for Partial Summary Judgment at p. 6 (Example 2).

### 4. Witnesses may be subjected to an hour of "persuasion" to cooperate with the CPD before being given the Witness Advisory.

The Special Order also permits a detective – having confined a witness in circumstances in which a reasonable person would not believe that he was free to leave – to "interview" that person for up to an hour before providing him with the Witness Advisory. *See* Ex. G at § V(D). Chief Maher explained in her deposition that the purpose of this provision is to give detectives up to one hour to "persuade" a witness to cooperate in an investigation prior to informing the witness that he is free to leave the Police facility. Ex. C at 190.

Thus, it would be consistent with CPD policy for a detective to transport a witness to an area headquarters; to search that person and remove his cell phone, shoelaces and belt; to lock that witness alone in an interview room; to deny him access to any telephone; to leave him incommunicado for an hour or more (up to two hours); and then to subject the witness to an hour-long interview, seeking to "persuade" him to cooperate with the Police – all before informing the witness that he is free to leave. *See* Ex. H at p. 6 (Example 1).

### D. The CPD's "New" Witness Policy In Practice.

The CPD does not keep track of the number of occasions on which the Witness Advisory has been given to persons in a Police facility and claims not to have the ability to determine the number of occasions on which the Witness Advisory has been given. *See* Defendant City of Chicago's Amended Answers to Plaintiff's Second Set of Interrogatories (Nos. 4-6), attached as Ex. K in support of the Plaintiff Class Motion for Partial Summary Judgment.

Nonetheless, it is a fair inference that scores (if not hundreds) of witnesses are interviewed each year in Police facilities. The circumstances in which a substantial portion of those witnesses are confined are such as to warrant giving the Witness Advisory. University of

Chicago law students working under the supervision of the plaintiff class counsel examined a random sample of 12 of the CPD homicide files that were opened and closed subsequent to January 16, 2006, the date of implementation of the Special Order. That review determined that, in that sample of 12 cases, 82 witnesses were questioned by CPD detectives at Police facilities. The detectives' General Progress Reports document that only 11 of these 82 witnesses were given the Witness Advisory. *See* Affidavits of Andrew Kuo and Gwendolyn Morales, attached as Ex. L in support of the Plaintiff Class Motion for Summary Judgment. As of mid-July, the CPD had opened 235 homicide investigations in calendar year 2006.

Extrapolating from these figures, it is apparent that, under present practice, the Witness Advisory is – or should be – given on numerous occasions.

## ARGUMENT

Under Rule 56 of the Federal Rules of Civil Procedure summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Jackson v. Midland Credit Mgmnt., Inc*., 2006 U.S. Dist. LEXIS 58279 at *4 (N.D. Ill. August 18, 2006) (Holderman, J.). That standard is satisfied in this case. The facts that demonstrate the facial unconstitutionality of the CPD's Special Order are admitted and are not in dispute. A pure question of law is presented.

**I.    THE SPECIAL ORDER IS UNCONSTITUTIONAL ON ITS FACE: THE POLICE VIOLATE THE FOURTH AMENDMENT WHEN THEY CONFINE WITNESSES FOR UP TO THREE HOURS WITHOUT INFORMING THEM THAT THEY ARE FREE TO LEAVE.**

It is abundantly clear that (absent any advisory to the effect that he is free to leave) a witness who has been (a) transported to a CPD area headquarters and (b) locked in a barren, cell-

like room (c) after having been thoroughly searched, (d) deprived of his cell phone, shoelaces, belt and identification papers (e) refused permission to use the telephone (despite insisting) and (f) denied access to family, friends and his attorney – is "seized" in violation of the Fourth Amendment.

Over a quarter century ago, the United States Supreme Court, in *Dunaway v. New York,* 442 U.S. 200 (1979), addressed this situation. The Court explained the circumstances in which petitioner Dunaway was held and questioned by the police:

> The petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.

*Id.* at 212-13. Noting that "the detention of petitioner [Dunaway] was in important respects indistinguishable from a traditional arrest," the Court had no difficulty concluding that Dunaway was seized in violation of his Fourth Amendment rights. *Id.* at 212, 219. The Court also soundly rejected the contention that it might be appropriate to hold individuals on less than probable cause for "investigatory purposes" based on police "suspicion" that they might possess "intimate knowledge about a serious and unsolved crime." *Id.* at 207, 219.

Since *Dunaway*, the Supreme Court has not needed to revisit the question of whether persons locked in police interrogation rooms against their will have been "seized" for purposes of the Fourth Amendment. The point is obvious. Throughout this litigation, the City has never even attempted to distinguish the Supreme Court's authoritative pronouncement in *Dunaway* as to the patent unconstitutionality of locking up persons the police "suspect" of having "knowledge" about a serious crime – but whom they lack probable cause to arrest.

During the preliminary injunction hearing, the City claimed (in the teeth of *Dunaway*) that witnesses confined in Police interrogation rooms were free to leave. Now, however, in the

11

new Special Order, the CPD abandons that fiction.  Under the Order, the Witness Advisory must be given when "*the circumstances surrounding a witness in a Police Facility are such that a reasonable person in the witness's position would have believed that he/she was not free to leave*."  (Emphasis added.)  Ex. G at V(D).

This formulation in the Special Order as to when to give the Witness Advisory precisely mirrors the Supreme Court's longstanding formulation of whether a person has been "seized" so as to implicate the Fourth Amendment's probable cause requirement: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980).  In other words, the CPD now admits that the Advisory is required for witnesses who (if they were not told of their freedom to leave) would be deemed to have been "seized" under the Fourth Amendment.

Indeed, the CPD Training Bulletin, promulgated to afford detectives guidance in applying the Special Order, clarifies that the witness advisory *is required* (emphasis in the Training Bulletin) – *i.e.*, that a reasonable person would believe that he was not free to leave – when a witness to a homicide: (a) has been "guid[ed] to a police car" and driven to the area headquarters' (b) has had his cell phone taken away from him; (c) has been locked in ana interview room for "several hours;" and (d) has banged on the door, but no one has answered. Ex. H at p. 6.

These are precisely the conditions that plaintiff class witnesses Kyle Davis, Ramon Ayala, Josefina Rodriguez, Candace McGee, Gail Johnson, Natalie McFall and Frederick Tarver so vividly described in their preliminary injunction hearing testimony. Thus, the CPD baldly admits that when, in investigations of homicides and other serious, violent felonies, its detectives

treat witnesses in accordance with standard operating procedures – they seize those individuals for Fourth Amendment purposes.

The Special Order is facially unconstitutional because it permits CPD detectives – having seized a witness and locked him into a Police interrogation room -- to delay up to three hours before informing that person that he is free to leave. The Order is also unconstitutional because it permits detectives to spend up to an hour trying to "persuade" a witness to cooperate in their investigation before they must tell the witness that he is free to leave. Witnesses, by definition, are persons whom the Police do not have probable cause to arrest. Without probable cause, the Police may not hold a person involuntarily in a locked room for a period of up to three hours and, for an hour of that time, engage the person in a "persuasive interview" in order to gain their cooperation. Those activities, officially authorized under CPD policy, are blatantly unconstitutional.

The plaintiff class knows of no authority that could justify seizing and holding a witness in a locked police interrogation room for up to three hours without probable cause. To the contrary, it is very clear that the police may *not* detain a person in a police station for "investigatory" purposes unless they have *probable cause* to do so. *See, e.g., Davis v. Mississippi*, 394 U.S. 721, 726 (1969); *Hayes v. Florida,* 470 U.S. 811, 815 (1985); *Dunaway v. New York,* 442 U.S. at 207, 219.[7] The Special Order, however, permits the CPD to do just that – for up to three hours in isolation and for up to an hour of persuasive interviewing.

---

[7] It is of course true that the police are permitted under the Fourth Amendment to make brief, non-intrusive investigatory stops of citizens on the street. *Terry v. Ohio,* 392 U.S. 1, 21 (1968). But, to pass constitutional muster, such stops must be *brief* and relatively non-intrusive. Moreover, although probable cause is not required, the police must have reasonable suspicion that the individual is engaged in criminal conduct. A three hour detention in a police interrogation room is neither brief nor non-intrusive. And here, the Special Order concerns *witnesses*, and it permits three hour detentions *on no suspicion at all.* Plainly, *Terry* and its progeny do not save the Special Order from its facial unconstitutionality.

The Special Order is unconstitutional on its face. This Court should therefore enter an injunction directing the Police that, if they wish to hold persons in locked interview rooms in Chicago police stations, they must *immediately* advise those individuals that they are free to leave and do not have to remain there against their will

## CONCLUSION

For the foregoing reasons, this Court should enter an order granting partial summary judgment in favor of the plaintiff class, holding that the provisions of the Special Order that authorize CPD detectives to hold individuals for up to three hours in circumstances in which a reasonable person would feel that he was not free to leave are unconstitutional on their face, and enjoining the CPD that, if they wish to hold persons in locked interview rooms in Chicago Police stations, they must immediately advise those individuals that they are free to leave and do not have to remain there against their will.

Respectfully submitted,

**KYLE W. DAVIS, individually and on behalf of a class of similarly situated persons**

By: /s/ Locke E. Bowman
     One of his attorneys

Craig B. Futterman
H. Melissa Mather
Mandel Legal Aid Clinic
University of Chicago Law School
6020 South University
Chicago, IL 60637
773-702-9611

Locke E. Bowman
MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Ave.
Chicago, IL 60611
312-503-0844

14