## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KYLE W. DAVIS, | ) | |
| individually and on behalf of a class of | ) | |
| similarly situated persons, | ) | 05 C 1967 |
| Plaintiff, | ) | Judge Holderman |
| v. | ) | |
| | ) | Magistrate Judge Mason |
| CITY OF CHICAGO, et. al., | ) | |
| Defendants. | ) | |

### DEFENDANTS' LOCAL RULE 56.1(a)(2) MEMORANDUM
### IN SUPPORT OF THEIR MOTION  FOR SUMMARY JUDGMENT

Defendant City of Chicago ("City") and Defendant Phil Cline, by Mara S. Georges, Corporation Counsel for the City of Chicago, move for summary judgment in their favor and against plaintiff pursuant to Fed. R. Civ. P. 56.  In support of their motion, defendants state:

### INTRODUCTION

Despite this Court's  denial of plaintiff's motion for preliminary injunction, plaintiff now seeks a permanent injunction against the City on the same bases as were previously rejected. Plaintiff here again fails to demonstrate that the City has a policy or practice in place that permits CPD personnel to hold witnesses in criminal investigations against their will in CPD facilities. Instead, the uncontested facts clearly demonstrate that the CPD has created and implemented a Detective Division Special Order ("Special Order") and revised a CPD General Order ("General Order") to specifically state that witnesses are always free to leave and are not to be held in any CPD facility against their will.  Plaintiff cannot demonstrate any likelihood that any future witness in a criminal investigation will be held against her will in a CPD facility based on a policy or practice. Moreover, plaintiff has failed to meet his burden of proof on the other elements required for a permanent injunction, most significantly that any witness held against her will would have irreparable injury.   Finally, plaintiff has failed to adduce any evidence of "supervisory liability"

on the part of Defendant Cline.   For these reasons, summary judgment for defendants should be granted.

## STATEMENT OF THE CASE

### I.    Factual Allegations

Plaintiff has alleged that from May 30,2005 through May 31, 2005, he was held at the CPD facility at Area 2 against his will in violation of the Fourth Amendment.  (D.S. at ¶7) .[1]  He alleged that he was held against his will pursuant to the policy, practice, and custom of the CPD to detain persons whom the CPD believe are witnesses to certain crimes for extended periods of time against their will and confining them in locked interrogation rooms at police stationhouses.  (D.S. at ¶8).

### II.    Claims Asserted in the Second Amended Complaint

Plaintiff brings a claim for injunctive relief, alleging that the City has a policy and practice of holding witnesses in criminal investigations in CPD facilities in violation of the Fourth Amendment.  (D.S. at ¶8).  Plaintiff also asserts a §1983 claim for supervisory liability against Defendant Cline.  (D.S. at ¶10).[2]

## FACTS

_____The relevant facts are set forth in the City's Local Rule 56.1(a)(3) Statement of Facts.

## STANDARD OF REVIEW

Rule 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[1]Defendants' 56.1(a)(3) Statement of Uncontested Facts will be abbreviated as "D.S."

[2]Plaintiff seeks punitive damages against Defendant Cline.  However, plaintiff has adduced no evidence of wrongdoing on the part of Defendant Cline, much less evidence that any of his conduct was malicious or in reckless disregard of plaintiff's rights.  _See, Smith v. Wade_, 461 U.S. 30, 56 (1983); Seventh Circuit Manual of Model Civil Jury Instructions § 7.24 (2006).

show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of identifying those portions of the pleadings, depositions, and other discovery-related materials that demonstrate an absence of a genuine issue of material fact.[3] The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[4] "Merely alleging a factual dispute cannot defeat the summary judgment motion."[5] To defeat a motion for summary judgment, the nonmoving party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts.[6]

The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor.[7] Thus, "[s]ummary judgment is not a discretionary remedy. If a plaintiff lacks enough evidence, summary judgment must be granted."[8]

---

[3] *Celotex Corporation v. Catrett,* 477 U.S. 317, 323 (1986).

[4] *Id*. at 324.

[5] *Samuels v. White*, 871 F.2d 1346,1349 (7th Cir. 1989), *citing*, *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242,247- 48 (1986); *see also Bellaver v. Quanex Corporation*, 200 F.3d 485, 492 (7th Cir. 2000).

[6] *Anderson*, 477 U.S. at 256.

[7] *Lawrence v. Kenosha County*, 391 F.3d 837, 842 (7th Cir. 2004); *see also Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'" (*quoting Schacht v. Wisconsin Dep't of Corr.,* 175 F.3d 497, 504 (7th Cir. 1999)).

[8] *Jones v. Johnson*, 26 f.3d 727,728 (7th Cir. 1994), *aff'd*, 515 U.S. 304 (1995).

3

**ARGUMENT**

**I.      Plaintiff Has Failed to Satisfy Any Element for Issuance of a Permanent Injunction.**

For this Court to grant plaintiff's motion for permanent injunction, the Court must determine whether he has shown (1) success, as opposed to a likelihood of success, on the merits; (2) irreparable harm; (3) the benefits of granting the injunction outweigh the injury to the defendants; and (4) the public interest will not be harmed by the relief requested.[9]  Plaintiff is unable to satisfy any of these required elements nor demonstrate that there exists a genuine issue of material fact as to any of them.  Thus, this Court should grant defendants' motion.

**A.      Plaintiff has not shown success on the merits.**

Plaintiff has brought a *Monell* claim alleging that the City has a policy or practice of holding witnesses in criminal investigations in CPD facilities against their will.  (D.S. at ¶8).  In order to succeed on a *Monell* claim, plaintiff must first establish that he and a class of similarly situated persons suffered a constitutional injury.[10]  Plaintiff must then establish that the constitutional deprivation was pursuant to an official policy of the municipality.[11]  Next, plaintiff must establish the requisite degree of culpability on the City's part – namely, that the alleged municipal practices were engaged in "with 'deliberate indifference' as to [their] known or obvious consequences." [12] Plaintiff must also demonstrate the existence of a direct causal link between the policy and the

---

[9]*Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003).

[10]*Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994).

[11]*Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986).

[12]*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Bd. of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997).

4

constitutional injury. [13] It is plaintiff's burden to show the policy or custom.[14]

Plaintiff has three means by which to prove a municipal policy: "(1) an express policy that, when enforced, cause[d] a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, [was] so permanent and well settled as to constitute a custom or usage with the force of law; or (3) the act of a person with final policymaking authority."[15] Here, plaintiff has not alleged that any constitutional deprivation was caused by either an express policy or by the act of a person with final policymaking authority.[16] Instead, his policy claim falls into the category of "widespread practice": the alleged "permanent and well-settled" custom of holding witnesses in criminal investigations in CPD facilities against their will.

Plaintiff lacks any evidence to meet his burden of proof. No evidence has been adduced that the alleged "policy" even exists, much less that the elements of "deliberate indifference" or "causation" have been satisfied. Therefore, summary judgment should be granted in the defendants' favor.

1.  ***No evidence satisfies the requirement for establishing municipal liability for the alleged custom.***

Plaintiff alleges that there exists a custom of holding witnesses in criminal investigations in

---

[13]*City of Canton*, 489 U.S. at 385; *Bryan County*, 520 U.S. at 404.

[14]*Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003).

[15]  *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

[16]While plaintiff has argued that Defendant Cline is the "final policymaker" for the CPD and thus for the City, this is clearly a mistaken view of the law.  *See, Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001), *citing, Auriemma v. Rice*, 957 F.2d 397 (7th Cir. 1992) (the Superintendent of Police is not a policymaker for the City).

a CPD facility against their will.  However, plaintiff has no factual support for this allegation.  There is no evidence showing that this alleged custom exists at all; at a minimum, the evidence demonstrates that this custom does not exist at a level constituting a "policy" as defined by *Monell* and its progeny.  Similarly, no evidence establishes "acquiescence" or "deliberate indifference" by the City or demonstrates the necessary causal like between the alleged custom and plaintiff's injury.

A practice of unconstitutional conduct, lacking formal approval, may provide the basis for municipal liability only if the plaintiff can prove that the final policymaking authority both knew of and acquiesced in a pattern of unconstitutional conduct.[17]  Custom can be established through widespread, enduring practices that violate constitutional rights in a systematic manner.[18]  Although evidence of a persistent and deeply rooted pattern permits the inference that policymakers must have known of its existence, the plaintiff must still prove that the policymaking authority acquiesced in the pattern of unconstitutional conduct.[19]  Acquiescence must be shown by proving that the persons responsible for making municipal policy have demonstrated deliberate or reckless indifference to complaints of misconduct.  If the policymakers take steps to eliminate the alleged practice, the fact that the steps are not effective is insufficient to establish acquiescence (and thus adoption) of the complained-of practice as a "policy."[20]

---

[17] *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993).

[18] *McNabola v. Chicago Transit Authority*, 10 F.3d 501 (7th Cir. 1993).

[19] *See, McNabola*, 10 F.3d at 511.

[20] *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).

### 2.   *A custom of holding witnesses in criminal investigations in CPD facilities against their will does not exist.*

Plaintiff alleges a custom of holding witnesses in criminal investigations in CPD facilities against their will. The evidence clearly demonstrates that the alleged "custom"does not exist. CPD General Orders and Special Orders, which embody the department's system-wide policies regarding the treatment of witnesses, specifically state that all police action regarding witnesses shall be in accordance with the Fourth Amendment and that a witness is always free to leave.[21] (D.S. at ¶¶20-23, 25).   The purpose of Detective Division Special Order 06-01 ("Special Order") is to memorialize the uniform standard of treatment of witnesses and to inform all police personnel of the manner in which the CPD has always expected them to treat witnesses so that there is no misunderstanding of the proper method of treating a witness. (D.S. at ¶ 25,43). By implementing the Special Order, the CPD was not trying to change any established police practice in any way related to the treatment of witnesses. (D.S. at ¶ 44). Rather, the CPD implemented the Special Order to ensure that constitutional standards were understood and uniformly applied throughout the Department and then documented. (D.S. at ¶ 45-46). Thus, the evidence clearly demonstrates that no custom ever previously existed or currently exists to hold witnesses in criminal investigations in CPD facilities against their will.

Moreover, the Special Order was not created as an empty gesture to appease this Court.[22]

---

[21]The CPD revised General Order 04-03 on July 12, 2006, to add language stating witnesses will not be held or detained against their will at a district station or other Department facility. (D.S. at ¶21). On January 17, 2006, the CPD made effective Detective Division Special Order 06-01 that states witnesses shall not be held against their will in Detective Division facilities. (D.S. at ¶¶23,26).

[22]It is important to note that by assertively informing witnesses that they are free to leave, the Special Order requires the CPD to conduct itself in a manner above the requirements of the Fourth Amendment. *First Defense Legal Aid v. City of Chicago*, 319 F.3d 967, 970 (7th Cir. 2003). No other law enforcement agency has taken similar steps to ensure that the constitutional rights of witnesses are

Prior to making the Special Order effective, the CPD notified the deputy chiefs and commanders of the Detective Division of the creation and implementation of the Special Order so that the deputy chiefs and commanders would have the opportunity to discuss the Special Order with CPD personnel under their control.  (D.S. at ¶ 34).  Further, after the Special Order became effective,  the CPD distributed a Detective Division Training Bulletin ("Training Bulletin") to provide training on the Special Order.  Once the CPD distributed the Training Bulletin, CPD General Counsel Sheri Mecklenburg and Deputy Chief Michael Chasen visited all of the Detective Division Areas and trained current detectives on the Special Order.  (D.S. at ¶¶35-37).  During these training sessions, General Counsel Mecklenburg and Deputy Chief Chasen reviewed the Special Order and Training Bulletin with the current detectives, answered questions posed by the detectives, and gave a "real life" context to the Special Order.  (D.S. at ¶37-38).  Also, the CPD created a video to provide additional training on the Special Order.  (D.S. at ¶39).  This video is located on the Detective Division website and accessible to all detectives.  (Id.).  Thus, all current detectives and CPD personnel who work with the Detective Division have been trained through a variety of methods on the Special Order.[23]

Similarly, incoming detectives have not been left in the dark.  The CPD trains incoming detectives on the Special Order as part of the interviews and interrogation curriculum during detective school. (D.S. at ¶ 40).  During detective school, incoming detectives are provided the Special Order and Training Bulletin, attend lectures on the Special Order, and have the opportunity

---

protected.  (D.S. at ¶24).

[23]Other CPD personnel, who do not work in the Detective Division, have received notice of the Department's position in following the constitutional standards for the treatment of witnesses through the revision of General Order 04-03 which adds language stating witnesses are not to be held or detained against their will at a district station or other Department facility.  (D.S. at ¶21).

to ask questions regarding the practical application of the Special Order.  (D.S. at ¶¶ 41-42).

Furthermore, the CPD has monitored the effectiveness of the implementation of the Special Order.  First, Chief of Detectives Maria Maher requested that the five Detective Division Areas conduct an audit to make certain detectives were complying with the requirements of the Special Order. (D.S. at ¶58).  After reviewing the results of this survey, Chief Maher determined that while detectives were documenting instances when they provided the Witness Advisory to witnesses, detectives were failing to specifically document the circumstances surrounding instances when they did not provide the Witness Advisory to witnesses.  (D.S. at ¶59).  As a result of this first survey, Chief Maher requested a second audit of the Detective Division.  (D.S. at ¶60).  One purpose of the second audit was to reinforce the requirements of the Special Order with the detectives.  (D.S. at ¶¶ 62-63).  After reviewing the results of the second audit, Chief Maher determined that detectives, for the most part, are acting in compliance with the Special Order.  (D.S. at ¶ 67).  However, it became clear that a need existed  for an automated method that requires detectives to document whether they provided the Witness Advisory to a particular witness or the circumstances creating voluntariness on the part of the witness, negating the need for the Witness Advisory.  (D.S. at ¶65).  Therefore, the CPD is in the process of creating an automated screen within detectives's supplemental reports that requests this information about the Witness Advisory.  (D.S. at ¶ 66).  The CPD recognizes that it is important for it to monitor and verify that detectives are following the requirements of any special order promulgated by it.  (D.S. at ¶64).  This Special Order is no different.

Thus, not only is the CPD's express policy the opposite of that alleged, plaintiff has adduced no evidence indicating that the alleged practice is so pervasive and deeply imbedded as to constitute

an informal municipal custom.[24]  And even assuming *arguendo* that there was evidence showing the existence of an alleged custom, there is a fatal dearth of evidence indicating that the City's policymaking authority informally sanctioned or acquiesced in that custom, or that the custom directly caused plaintiff's injury.[25]  Therefore, plaintiff cannot demonstrate any modicum of success on his *Monell* claim that the City has a practice or custom of holding witnesses in criminal investigations in CPD facilities against their will.  As a result, plaintiff fails to meet the first requirement of a permanent injunction and defendants' motion should be granted.

### B.      Plaintiff will not suffer irreparable harm if the permanent injunction is not issued.

Plaintiff cannot demonstrate that he, and the class of persons he represents, will suffer irreparable harm if the permanent injunction is not issued.   Presently, the evidence demonstrates that the CPD has created and implemented a Special Order that outlines the proper treatment of

---

[24]During the preliminary injunction hearing, plaintiff only adduced evidence that over a period of four years, just seven persons *claimed* that they were held as witnesses in criminal investigations in CPD facilities in violation of the Fourth Amendment.  This small number of claims, measured against the thousands of witnesses involved in criminal investigations (D.S. at ¶72), certainly is not evidence of a "permanent and well-settled" custom or practice giving rise to *Monell* liability on the part of the City.  *See Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002)(three examples are insufficient to demonstrate a custom or practice); *see also, Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police force.").

[25]Because the City Council is the "final policymaker" for the City, plaintiff must demonstrate deliberate indifference on the part of the City Council to systemic violations of the Fourth Amendment with regard to witnesses in criminal investigations in order to satisfy the requirements of the City's *Monell* liability.  *Auriemma v. Rice*, 957 F.2d 397 (7th Cir. 1992).  Plaintiff has introduced absolutely *no* evidence of knowledge (either direct or inferential) on the part of City Council that the CPD allegedly had a custom or practice of holding witnesses in criminal investigations in CPD facilities in violation of the Fourth Amendment and *no* evidence of deliberate indifference to this alleged practice by the City Council. (D.S. at ¶¶ 75-76).  As for direct causation, plaintiff has adduced no evidence that he or anyone else was "held against his will" as a direct result of a "custom or practice," versus the result of negligence or the specific acts of a particular detective in a specific case.  Thus, his *Monell* claim against the City fails on these elements as well.

witnesses in a criminal investigation who are being interviewed at a CPD facility and revised a

General Order to add language stating witnesses are not to be held or detained in a CPD facility

against their will. (D.S. at ¶¶ 21, 23, 26-33). Thus, plaintiff cannot show that he, or the class of

persons he represents, will suffer *any* harm as a result of CPD policies or practices with regard to

the treatment of witnesses in criminal investigations who are located at CPD facilities.[26]

Moreover, plaintiff has not demonstrated that money damages would not suffice to repair

any harm caused by an alleged false arrest.[27] As an initial matter, *plaintiff himself* and Mr. Ayala

(a prior co-plaintiff) sought and accepted a monetary award during the course of this litigation for

their alleged constitutional injuries of false arrest. (D.S. at ¶78). It is untenably hypocritical for

plaintiff to accept monetary damages as sufficient to remedy the violation of *his* constitutional rights,

but an insufficient remedy for any future witnesses who may be harmed by the same alleged

conduct. If monetary damages are a sufficient remedy for allegedly detaining witnesses against their

will, as plaintiff, Mr. Ayala, and all of plaintiff's witnesses in the preliminary injunction hearing

plainly regard them to be, that must hold true uniformly, regardless of the persons whose names

appear in the caption.[28] In *Campbell v. Miller*, the Seventh Circuit stated that "damages are a

normal, and adequate, response to an improper search or seizure, which as a constitutional tort often

---

[26]Injunctive relief is forward looking; therefore, plaintiff must show that future members of the class will suffer harm if the injunction is not entered. *See O'Sullivan v. city of Chicago*, 396 F.3d 843, 857-58 (7th Cir. 2005).

[27]*See, Fleet Wholesale Supply Co. v. Remington Arms Co.,* 846 F.2d 1095, 1098 (7th Cir. 1988) ("To say that the injury is irreparable means that the methods of repair (remedies at law) are inadequate.").

[28]During the course of this litigation, the City settled with the all of the plaintiffs in *Gail Johnson, et al. v. City of Chicago, et al.,* 03 C 6620 (Hart, J.) for monetary damages. (D.S. at ¶77). As this Court will remember, plaintiff's attorneys brought in *Johnson* the same claims against the City and Defendant Cline as they have brought in *Davis*; the only difference being that the *Johnson* plaintiffs sought monetary damages only.

is analogized to (other) personal-injury litigation."[29]  In *Campbell*, the Seventh Circuit upheld the denial of plaintiff's request for a preliminary injunction in the context of body cavity searches conducted by the Indianapolis Police Department.[30] The Seventh Circuit reached its decision on the grounds that the plaintiff had an adequate remedy at law and that therefore he lacked standing to pursue injunctive relief on behalf of himself and all misdemeanor arrestees.[31] The Seventh Circuit's ruling in *Campbell* is precisely on point.

Finally, plaintiff cannot rely on the presumption that "plaintiffs who can show the denial of a constitutional right 'as a matter of law, also satisfy the burden of showing irreparable harm.'"[32] As stated above, plaintiff cannot demonstrate that any constitutional right has been violated under the Fourth or Fourteenth Amendments, and thus, he is not entitled to substitute this legal presumption for actual evidence of irreparable harm. Therefore, plaintiff cannot carry his burden of demonstrating that they will suffer irreparable harm if the permanent injunction is not issued.

### C. Any speculative benefits of granting the injunction do not outweigh the injury to the defendants and the public.

Plaintiff cannot demonstrate any benefit in granting the permanent injunction.  However, the injury to the defendants and the public in granting the injunction is manifest.  It is the purpose of the CPD to solve crimes and help prevent additional crimes.  Fundamentally, plaintiff desires to interfere with legitimate law enforcement objectives of investigating and solving crimes and

---

[29]*Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004).

[30]*Id*. at 836.

[31]*Id*.

[32](Plts' Mtn for Preliminary Injunction at 8, citing *David K. v Lane*, 839 F.2d 1265, 1268 (7th Cir. 1988)).

ultimately protecting public safety by tampering with existing practices that both respect the rights of witnesses and facilitate the goals of the police.

At this point in the proceedings, plaintiff still has not outlined the CPD activities that would be the subject of an injunction. Thus, defendants and this court are left to speculate as to what CPD police officers would be enjoined from doing with regard to witnesses. As stated in the Special Order, detectives must provide the Witness Advisory to witnesses in CPD facilities when the circumstances surrounding an individual's presence in the CPD facility would lead a reasonable person to believe that he or she was not free to leave. (D.S. at ¶¶ 29-31). Further, the Witness Advisory must be given within a reasonable period of time. (D.S. at ¶¶ 29-31). Moreover, the Special Order requires detectives to ensure the comfort and overall well-being of the witness while in a CPD facility to the extent reasonably possible, including access to bathroom facilities, telephone, food and drink on a reasonable basis. (D.S. at ¶33). Thus, it is unclear what is left to be the subject of plaintiff's motion for injunctive relief: All that apparently remains to enjoin is the very presence of witnesses in CPD facilities. But to enjoin defendants from interviewing witnesses in CPD facilities would be clearly harmful to defendants and the public at large. (D.S. at ¶73-74). Essentially, if such an injunction were granted, many criminal investigations would grind to a halt.

As the Seventh Circuit stated in *Campbell*, "[e]rroneous grants of injunctive relief that hamper enforcement of the criminal law have the potential to cause havoc, while erroneous awards (or denials) of damages to a single person have more limited ability to injure the general public." [33] Further, "[w]hen the costs of false negatives are low - - and this is what it means to say that the remedy at law is adequate - - there is correspondingly slight reason to incur the risk of premature

---

[33]*Campbell v. Miller*, 373 F.3d 834, 835-36 (7th Cir. 2004).

13

or over broad injunctive relief." *Id.* at 836.   CPD follows the law with respect to the treatment of witness - - that is, that by virtue of their status as witnesses, these individuals are always free to terminate any interview and leave a police facility.  (D.S. at ¶¶ 51-57, 71).  What plaintiff seeks is to prevent CPD from interviewing witnesses in any instance.  To hamper effective law enforcement strategies in investigating and solving crimes would greatly injure not only defendants, but the public at large.  Because the balance of harms weighs greatly in favor of defendants and the public interest, this Court should deny plaintiff's motion for permanent injunction.

## II.   Plaintiff Has Failed to Establish Supervisory Liability of the Part of Defendant Cline.

### A.   Plaintiff has no evidence for Supervisory Responsibility Under Section 1983.

The principles expounded in *Monell* and its progeny preclude vicarious liability on the part of supervisory employees.  Instead, to be held liable for the conduct of their subordinates, supervisors must have been personally involved in that conduct.[34]  Mere negligence, or even gross negligence, by supervisors will not suffice to create liability under Section 1983.[35]  Instead, plaintiff must prove the supervisor's knowledge of the unconstitutional conduct and her deliberate indifference to it.[36]

Plaintiff has adduced no factual evidence necessary for supervisory liability under Section 1983.  Plaintiff cannot present any evidence that Defendant Cline knew of any instances of improper treatment of witnesses or that Defendant Cline was deliberately indifferent to treatment of witnesses in violation of the Fourth Amendment.  (D.S. at ¶75-76).  To the contrary, the evidence shows that

---

[34]*Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

[35] *Id.*; *McPhaul v. Bd. of Comm'r of Madison County*, 226 F.3d 558, 566 (7th Cir. 2000).

[36]*Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003).

when Defendant Cline became aware of the allegations in plaintiff's motion for preliminary hearing, Defendant Cline met with CPD personnel to discuss and create a Special Order that would memorialize the proper treatment of witnesses in CPD facilities in accord with the requirements of the Fourth Amendment and revise the General Order to specifically address the rights of witnesses. (D.S. at ¶¶ 12,19,21,23).

Defendant Cline's title, without more, does not establish "personal involvement" in the alleged wrongful detention of plaintiff.[37]  Plaintiff has presented no evidence that Defendant Cline knew of plaintiff's allegations or the allegations of any other witness who claimed to have been held against her will in a CPD facility.  Further, plaintiff can point to no evidence that Defendant Cline personally participated in or knew of any specific alleged detention of plaintiff or any member of the class.  Finally, plaintiff fails in producing evidence that Defendant Cline directed anyone to participate in the constitutional violations alleged by plaintiff.  Thus, plaintiff's claim for supervisory liability must fail.

<u>**CONCLUSION**</u>

For the reasons set out above, this court should deny plaintiff's motion for injunctive relief and supervisory liability against Defendant Cline.  Plaintiff has a heavy burden to meet to justify the drastic remedy he seeks, and he has failed to meet it.  Accordingly, defendants' motion for summary judgment on all remaining claims in plaintiff's second amended complaint should be granted.

Respectfully submitted,

MARA S. GEORGES
Corporation Counsel of the City of Chicago

---

[37]*Maltby v. Winston*, 36 F.3d 548 (7th Cir. 1994).

15

By:   ___/s/ Sara L. Ellis_____
SARA L. ELLIS
Assistant Corporation Counsel

30 North LaSalle Street
Room 1610
Chicago, Illinois 60602
(312) 744-6919
Attorney No. 06224868

DATED: August 30, 2006